**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 91-06717-CIV-ALTONAGA**

**THOMAS DEWEY POPE**,

      Petitioner,

vs.

**MICHAEL D. CREWS**, Secretary,
Florida Department of Corrections,

      Respondent.

_____/

## ORDER

Petitioner, Thomas Dewey Pope ("Mr. Pope"), is on death row at the Union Correctional

Institution in Raiford, Florida, following convictions in 1982 for first-degree murder.  Mr. Pope

filed an Amended Petition for Writ of Habeas Corpus by a Person in State Custody on February

19, 1999 [ECF No. 18].  On prior review, the Court issued an Order partially granting Mr. Pope's

Amended Petition with regard to claims of ineffective assistance of counsel during the penalty

phase of the state trial and denying Mr. Pope's remaining claims.  (*See* Dec. 8, 2008 Order ("Dec.

8 Order") [ECF No. 134]).  On appeal, the United States Court of Appeals for the Eleventh

Circuit agreed "that [Mr. Pope's] allegations, considered together, are powerful, and *if* he is able

to prove they are true, he would be entitled to habeas relief."  *Pope v. Sec'y, Dep't of Corr.*, 680

F.3d 1271, 1294 (11th Cir. 2012) (citation omitted) (emphasis in original).  However, the

Eleventh Circuit remanded the case for an evidentiary hearing, finding that the Court had erred

by ruling on "Pope's untested penalty-phase allegations" without first receiving evidence.[1]  *Id.* at

---

[1] Although "Pope exercised diligence in attempting to develop the factual basis of his penalty-phase claims before the state court," *Pope*, 680 F.3d at 1289, and even though the state courts ruled on the merits of Mr. Pope's ineffective assistance of counsel claims, a state court evidentiary hearing was never conducted on the substance of those claims.

1288.

On October 17, 18, 22, and 23, 2012, the Court held an evidentiary hearing ("2012 Hearing"), during which testimony and exhibits relevant to Mr. Pope's claim of penalty phase ineffectiveness of trial counsel were received.  Having reviewed the evidence, the Court finds that Mr. Pope has proven his allegations of penalty phase ineffectiveness.  Nevertheless, the veracity of Mr. Pope's allegations is not by itself sufficient to entitle Mr. Pope to relief.  For while Mr. Pope's claim was pending before the Eleventh Circuit, the Supreme Court issued *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), which constrains district courts from granting relief on a section 2254 habeas petition — where that claim was adjudicated on the merits by a state court and is subject to the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104–132, 100 Stat. 1214 (1996) ("AEDPA") — unless the petitioner can prove the state court decision was "unreasonable," 28 U.S.C. § 2254(d), based upon the state court record alone.  *Pinholster*, 131 S. Ct. at 1400 ("If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court.") (footnote call number omitted).

Because Mr. Pope's claims were adjudicated on the merits and the Amended Petition is governed by the AEDPA, *see Pope*, 680 F.3d at 1283–84, 1286, Mr. Pope must, pursuant to *Pinholster*, make a showing of state court unreasonableness without regard to the newly-presented evidence in order to be entitled to relief.  Following the 2012 Hearing, and at the undersigned's request (*see* January 22, 2013 Order ("Jan. 22 Order") [ECF No. 190]), the parties have presented additional briefing addressing the issue of state court unreasonableness.  (*See* Mem. of Petitioner ("Pope Mem.") [ECF No. 191]; Mem. of Respondent ("State Mem.") [ECF No. 195]).  The discussion that follows gives the background of this case; addresses the applicable standards of review; summarizes the record before the state court and the new

evidence presented at the 2012 Hearing; analyzes the threshold question of whether Mr. Pope has established, based upon the record that was before the state court, that the state court's adjudication resulted in a decision that unreasonably applied federal law pursuant to the deferential standard of 28 U.S.C. section 2254(d); and recounts the evidence from the 2012 Hearing that satisfies 28 U.S.C. section 2254(e), entitling Mr. Pope to habeas relief.[2]

## I.    BACKGROUND

### A.    Introduction

The pertinent facts underlying Mr. Pope's prosecution are set forth by the Florida Supreme Court as follows:

> On January 19, 1981, the bodies of Al Doranz and Caesar Di Russo were discovered in an apartment rented to Kristine Walters. Both had been dead several days but Di Russo's body was in a more advanced state of decomposition than Doranz's. Both victims had been shot, Doranz three times and Di Russo five times. A spent .22 caliber shell casing was found under Di Russo's body. Three days later, the body of Kristine Walters was found floating in a canal. She had been shot six times with exploding ammunition, her skull was fractured and she had been thrown into a canal while still breathing.
>
> All three victims had been shot with exploding ammunition, so ballistics comparison was impossible. However, parts of an AR-7 rifle were found in the canal near Walter's body and the spent shell casing under Di Russo's body had been fired from an AR-7 weapon.
>
> Investigation led to [Mr. Pope's] girlfriend, Susan Eckard, and ultimately police were able to show that Doranz purchased an AR-7 rifle for Pope shortly before the murder. Eckard and Pope admitted being with Doranz and Walters at Walters's apartment on Friday night, the night Doranz and Di Russo were killed. Eckard later testified that Pope arranged a drug deal with Doranz and Di Russo. She stated that she and Pope left Walters's apartment to visit Clarence "Buddy" Lagle and to pick up some hamburgers. They then returned to the apartment where Pope and Doranz convinced Walters to go with Eckard to the apartment where Pope had been staying.

---

[2] Mr. Pope's guilt phase ineffectiveness claims remain denied and were not at issue on remand.  Further, although the State raised arguments relating to procedural default and exhaustion of Mr. Pope's penalty phase claims, *see Pope*, 680 F.3d at 1284-87, the Eleventh Circuit ruled that neither prevents consideration of the claims.

Later that same night, Pope arrived at his apartment and told the women there had been trouble and that Doranz had been injured but that it was best for Walters to stay away from him for a while. Eckard said she knew that Di Russo and Doranz were dead, and that she had known Pope intended to kill them at this point. The next day, Walters checked into a nearby motel, where Pope supplied her with quaaludes and cocaine. On Sunday, Pope told Walters he would take her to see Doranz. Eckard testified that Pope had told her that he knew he had to get rid of Walters but that he regretted it because he had become fond of her. According to Eckard, Pope described Walters's murder when he returned and said the gun had broken when he beat Walters over the head with it. The next day Eckard went with Pope to the scene of the crime to collect fragments of the broken stock and to look for the missing trigger assembly and receiver. Buddy Lagle told the police he had made a silencer for the AR-7 rifle at Pope's request. Because Lagle planned to leave the jurisdiction to take a job on a ship in the Virgin Islands, he was deposed on videotape pursuant to an order granting the state's motion to perpetuate testimony. When the state was unable to produce him at trial, the videotape was admitted into evidence.

Pope was convicted of three counts of first degree murder . . . .

*Pope v. State*, 441 So. 2d 1073, 1074–75 (Fla. 1983).

## B.      Post-Trial State Court Proceedings

The pertinent facts of the post-conviction proceedings, including both the penalty phase of Mr. Pope's trial and the ensuing state and federal habeas proceedings, are recounted by the Eleventh Circuit as follows:

After the jury's guilty verdict, but before the penalty phase, Pope and his trial counsel had this exchange with the court, outside the jury's presence:

Eber: I have discussed the situation that is presently before us with Mr. Pope. I have discussed it informally with the Court. Mr. Pope does not wish me to argue to the jury at this point. I understand that it is my obligation as his attorney to do so, however. Mr. Pope feels that it is my obligation, as his attorney, to follow his wishes in this situation. I believe he may have something he desires to say, if the Court would entertain that. But I have told him, and I believe that it is my obligation to make a presentation to the jury.

The Court: Alright. If you want to say anything, Mr. Pope, you may.

CASE NO.  91-6717-CIV-ALTONAGA

Pope: I'd really rather not have him make a presentation on my behalf to the jury. You only have two choices, and I know what my choice is. I know I'm not trying to take your job, that is not what I want and is not necessarily what you are going to give me; but I would rather have the death sentence than the twenty-five years in prison.

The Court: Alright. I still think you ought to speak on his behalf as your obligation. You made your wishes known. I can understand that. Thank you. Bring the jury in.

During closing arguments, the prosecutor informed the jury that "Mr. Pope has announced that he would rather receive a death penalty than life imprisonment. I would say to you that your verdict, your recommendation, should not be based on that." Notably, defense counsel Eber did not object to this salient comment. Thereafter, the jury recommended life sentences for the murders of Di Russo and Doranz, and the death penalty for the murder of Walters. The jury voted nine to three for death.

The trial judge adopted the jury's sentencing recommendations. In so doing, the judge found four aggravating circumstances surrounding Walters's murder: (1) Pope was previously convicted of another capital felony (the murders of Di Russo and Doranz), Fla. Stat. § 921.141(5)(b); (2) the capital felony was committed for the purpose of avoiding a lawful arrest (for the murders of Di Russo and Doranz), *id.* § 921.141(5)(e); (3) the capital felony was especially heinous, atrocious, or cruel (in part because Pope failed to show any remorse), *id.* § 921.141(5)(h); and (4) the capital felony was a homicide committed in a cold, calculated, and premeditated manner (because Pope spent two days with Walters before murdering her), *id.* § 921.141(5)(i). The judge found one mitigating circumstance, the "catchall" provision, Fla. Stat. § 921.141(6)(h), because Pope had served in Vietnam and was honorably discharged from the Marines. The trial judge then sentenced Pope to die . . . .

Pope filed a direct appeal to the Florida Supreme Court, arguing, among other things, that the trial court erred in allowing Lagle's videotaped deposition to be presented to the jury. The Florida Supreme Court affirmed the convictions and sentences. *Pope*, 441 So.2d at 1074.

Pope's collateral attack began when he filed in state court a motion for post-conviction relief pursuant to Florida Rule of Criminal Procedure 3.850, claiming the ineffective assistance of counsel. The motion raised twelve errors by trial counsel, including [] five guilt-phase ineffectiveness claims [], as well as two penalty-phase ineffectiveness claims: (1) counsel's failure to object to improper comments made by the court and the prosecutor; and (2) counsel's failure to present mitigating evidence drawn from Pope's background. The trial court held that except for two of his claims, Pope's allegations were either insufficient to state a claim for ineffective assistance of counsel under *Strickland v. Washington,*

466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), or were specifically refuted by the record.

As for the two remaining claims, the court rejected the first one — concerning ineffective assistance stemming from the introduction of Lagle's videotaped deposition — because it found, after conducting an evidentiary hearing on the issue, that Lagle was indeed unavailable for trial. An evidentiary hearing was set on the second of Pope's remaining claims — that his trial counsel was ineffective for using the "Vietnam Syndrome Defense" against Pope's wishes. After the evidentiary hearing, the court denied this claim too, finding that Pope knew, understood, and concurred in his trial counsel's opinion that Dr. William Weitz's testimony regarding the Vietnam Syndrome Defense should be used during the guilt phase of the trial.

On appeal to the Florida Supreme Court, Pope argued that the trial court improperly failed to hold an evidentiary hearing on several claims raised in his motion for new trial, including the remaining guilt-phase ineffectiveness claims, as well as the penalty-phase ineffectiveness claims listed above. The Florida Supreme Court affirmed the trial court's denial of Pope's Rule 3.850 motion. *Pope v. State*, 569 So.2d 1241 (Fla. 1990) (per curiam).

During the pendency of the Rule 3.850 motion, Pope filed a petition for writ of habeas corpus with the Florida Supreme Court alleging ineffectiveness of appellate counsel. The Florida Supreme Court denied Pope's petition. *Pope v. Wainwright,* 496 So.2d 798, 800 (Fla. 1986). [] [T]he court agreed with Pope's claim that the prosecutor had made "clearly improper" comments during closing argument of the penalty phase, the "most bothersome" being "the comment on the petitioner's preference for death." *Id.* at 803. Nonetheless, the court held that "in light of the aggravating evidence presented . . . none [of the comments] are so egregious as to fundamentally undermine the reliability of the jury's recommendation." *Id.*

Following his initial state Rule 3.850 motion and petition for writ of habeas corpus, Pope filed in state court several other Rule 3.850 motions, several petitions for writ of habeas corpus, and miscellaneous motions attempting to raise new claims, and to cure procedurally defaulted claims and exhaust claims that the federal court subsequently deemed unexhausted. All of these filings were denied in turn. *See, e.g., Pope v. State,* 702 So.2d 221 (Fla. 1997) (per curiam), *reh'g denied* (Fla. 1998) . . . .

On September 9, 1991, Pope sought collateral relief in the United States District Court for the Southern District of Florida, filing a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Pope raised seven claims, some with multiple sub-claims, resulting in 61 claims in all. Most significantly for our purposes, Claim II alleged the ineffective assistance of penalty-phase counsel. The State argued failure to exhaust as a defense to this claim and others; the district court agreed, dismissing without prejudice Pope's petition because it

"contain[ed] both exhausted and unexhausted claims." Notably, the district court did not find Claim II unexhausted. Once the district court entered its order, the Clerk of Court entered a notation on the docket sheet characterizing the case as "closed."

Following litigation in state court to exhaust the unexhausted claims, Pope returned to federal district court and amended his federal habeas corpus petition on February 19, 1999. Along with his amended petition, Pope moved to "reopen proceedings." Claim II as developed in the amended petition was nearly identical to Claim II in Pope's original 1991 petition. The State again argued that Claim II was unexhausted. The district court rejected that defense, and ordered the State to respond on the merits to this claim. Thereafter, in July 2000, the State argued in a supplemental response to Pope's amended petition that the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104–132, 100 Stat. 1214 (1996) ("AEDPA"), applied to the case. Pope replied that the State had waived its AEDPA argument because it did not mention AEDPA in its prior answer to Pope's amended petition.

[]Pope sought an evidentiary hearing from the district court on all of his claims. The motion was denied and no hearing was conducted. Without resolving whether AEDPA applied to his petition, the district court relied on the "arguably less stringent" pre-AEDPA law to deny the request for an evidentiary hearing, because Pope had obtained a hearing in state court on "certain of the issues he presented, including ineffectiveness of trial counsel," presumably referring to the state court hearings on the introduction of the Lagle deposition and the use of the Vietnam Syndrome Defense during the guilt phase of the trial.

After various state and federal court filings, and after the Florida Supreme Court denied Pope's third state habeas corpus petition, Pope's federal petition for writ of habeas corpus now consisted of eight claims (comprised of 23 sub-claims), including ineffective assistance of counsel at the guilt and penalty phases of the trial. In September 2006, the State filed a second supplemental response to Pope's amended petition, and, this time, among other things, "withdr[ew] its suggestion that [AEDPA] applies."

In 2008, the district court ruled on the merits of Pope's federal petition for writ of habeas corpus. The district court granted the petition in part — regarding Pope's claim that he received ineffective assistance of counsel at sentencing — and rejected all of the remaining claims. In so doing, the district court first determined that AEDPA did not apply to Pope's petition, because his original petition had been filed on September 9, 1991, before the effective date of AEDPA. The court denied Pope's seven guilt-phase ineffective assistance claims, finding generally that he could not satisfy *Strickland*.

As for Pope's penalty-phase ineffective assistance claims, however, the district court concluded that counsel's failure to discover and present *any* of the ample available mitigation evidence fell below any objective standard of

reasonable representation. It reached this conclusion even though Pope had told the trial court and his counsel that he did not want to present any mitigating evidence to the jury, likening Pope's case to *Blanco v. Singletary,* 943 F.2d 1477 (11th Cir. 1991). The district court further determined that counsel's failure to object to the prosecutor's comment about Pope's stated preference for death over life imprisonment also fell below any objective standard of reasonableness. Given the combination of factors surrounding sentencing (including counsel's failure to present mitigating evidence, counsel's failure to object to the prosecutor's statement that Pope preferred to die, and three of the jurors' votes for a life sentence), the court concluded that there was a reasonable probability that but for counsel's errors Pope's jury would have returned a recommendation of life imprisonment.

The State moved to alter or amend the judgment, arguing this time, among other things, that AEDPA should apply to Pope's petition. In ruling on the motion, the district court declined to determine whether the State had waived its AEDPA argument, because, it concluded, the result would remain the same regardless of whether pre-AEDPA or post-AEDPA standards applied.   [A] timely appeal followed.

*Pope*, 680 F.3d at 1278–81 (alterations added; footnote call number omitted).

### C.    The Eleventh Circuit Opinion

In its review of the December 8, 2008 Order, the Eleventh Circuit ruled that the AEDPA

applies to the Amended Petition.  *See id.* at 1282.  The court framed the issues presented on

appeal as follows:

Pope's penalty-phase ineffectiveness argument has two components. First, the petitioner has argued that his trial counsel was ineffective because of counsel's alleged failure to conduct a reasonable investigation into Pope's life in order to find mitigating evidence to present during the penalty phase. Pope also claims that his counsel's "failure to object to prosecutorial misconduct an[d] improper argument" rendered the penalty-phase proceedings fundamentally unfair, resulting in the ineffective assistance of counsel.

*Id.* at 1284 (alteration in original).  Having concluded that Mr. Pope's penalty-phase claims were

properly before the court, the Eleventh Circuit addressed those claims:

[A]lthough Pope consistently sought an evidentiary hearing in state court to develop his penalty-phase claims, no hearing was ever held. Even the federal district court denied his request for an evidentiary hearing to develop these claims, albeit under pre-AEDPA law, on the ground that Pope had already participated in two state-court hearings. But these hearings barely touched on his

> counsel's performance during the *penalty* phase. The record, therefore, leaves us with Pope's untested penalty-phase allegations, and little, if anything else to consider. In the face of this procedural history, together with the substance of the claims, we are compelled to conclude that the district court erred in granting habeas relief on this barren record, and moreover, abused its discretion in denying Pope an evidentiary hearing to develop his claims. We, therefore, vacate the district court's decision, and remand the case with instructions for the district court to hold an evidentiary hearing.

*Id.* at 1287–88 (emphasis in original; footnote call number omitted).

Prior to concluding, the court noted that it is unclear "whether AEDPA *deference* applies to the state court rulings in this case once the district court has held an evidentiary hearing," as "neither the Supreme Court nor [the Eleventh Circuit] has said which standard of review applies to evidence properly developed in a federal hearing . . . ." *Id.* at 1294 n.16 (emphasis in original; alteration added) (citing *Holland v. Jackson*, 542 U.S. 649, 653 (2004); *LeCroy v. Sec'y, Fla. Dep't of Corr.*, 421 F.3d 1237, 1263 (11th Cir. 2005)). The answer to this question

> may depend on what evidence is uncovered in the federal court hearing, *see LeCroy,* 421 F.3d at 1263 n. 30 (noting that deference may not apply "[i]f the federal evidentiary hearing uncovers new, relevant evidence that impacts upon a petitioner's claim(s) and was not before the state court,' since 'it is problematic to ascertain how a federal court would defer to the state court's determination," but also recognizing AEDPA's strong preference for deference) . . . .

*Id.* Accordingly, the Eleventh Circuit instructed the undersigned to "address this question in the first instance." *Id.*

## II.    STANDARDS OF REVIEW

Pursuant to the AEDPA, courts confronted with a section 2254 petition raising claims that have been adjudicated on the merits by the state court must answer two questions prior to providing habeas relief: (1) whether the state court's adjudication of the claim was unreasonable under section 2254(d); and (2) if so, whether the petitioner is being held in custody in violation of the Constitution or laws and treaties of the United States. In order to determine whether Mr. Pope is entitled to habeas relief, the Court must first consider the record before the Florida

Supreme Court and, if the Florida Supreme Court's decision was unreasonable, then the Court

considers the evidence presented at the 2012 Hearing.

A.     Section 2254(d)

A highly deferential standard of review applies to federal habeas petitions subject to the

AEDPA where a claim was adjudicated on the merits in state court proceedings:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim—
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of
> the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Florida Supreme Court's decision is considered "contrary to" clearly established law

if that court arrived at a conclusion opposite to that reached by the Supreme Court on a question

of law or if the court confronted facts that are "materially indistinguishable" from relevant

Supreme Court precedent but arrived at a different result.  *See Pope*, 680 F.3d at 1283–84 (citing

*Williams v. Taylor*, 529 U.S. 362, 405 (2000) ("*Terry Williams*"); *Terry Williams*, 529 U.S. at 391

("It is past question that the rule set forth in *Strickland* qualifies as 'clearly established Federal

law, as determined by the Supreme Court of the United States.'").  The Florida Supreme Court's

decision is an "unreasonable application" of clearly established law if it unreasonably extends or

fails to extend a clearly established legal principle to a new context.  *See id.* (citing *Jennings v.

McDonough*, 490 F.3d 1230, 1236 (11th Cir. 2007)).  The Florida Supreme Court's factual

findings are presumed correct unless rebutted by the petitioner with clear and convincing

evidence, 28 U.S.C. § 2254(e)(1), and "[t]his presumption of correctness applies equally to

CASE NO.  91-6717-CIV-ALTONAGA

factual determinations made by state trial and appellate courts."  *Bui v. Haley*, 321 F.3d 1304, 1312 (11th Cir. 2003) (citing *Sumner v. Mata*, 449 U.S. 539, 547 (1981)).

### B.    Limitations of Section 2254(d) Review

When a district court is conducting a section 2254(d)(1) analysis, it is "limited to the record that was before the state court that adjudicated the claim on the merits."  *Pinholster*, 131 S. Ct. at 1398.  The review is so limited because "[i]t would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court." *Id.*

Mr. Pope[3] argues the Court need not conduct a section 2254(d)(1) analysis because the Eleventh Circuit implicitly made a finding of unreasonableness when it ordered a section 2254(e) evidentiary hearing on remand.  It is implicit, Mr. Pope asserts, because "[i]f the Eleventh Circuit agreed that Petitioner is entitled to relief if he could prove his allegations, then it must have found that the (d) inquiry under *Pinholster* has already been satisfied, because habeas relief would not otherwise be available."  (Pope Mem., 2).  In contrast, the State maintains that "there is no basis for Pope's claim that the Eleventh Circuit Court's opinion resolved the *Pinholster* issue."  (State Mem., 3).

The May 15, 2012 opinion in *Pope*, 680 F.3d 1271, does not cite to or reference the 2011 decision of *Pinholster*.  Rather, the issue of whether AEDPA deference applies to the state court ruling in this case "once the district court has held an evidentiary hearing" was left to the undersigned to resolve.  *Pope*, 680 F.3d at 1294, n.16.  While the Court chooses not to speculate why the Eleventh Circuit did not address *Pinholster*, the Court must acknowledge that Eleventh

---

[3]  Although Mr. Pope "believes that the nature of *Pinholster's* applicability in Florida is by no means clear and settled," he does acknowledge that generally *Pinholster* limits the district court's section 2254(d)(1) analysis to the state court record. (Pope Mem., 1, n.1).  Mr. Pope offers no support or explanation for the remarkable proposition that *Pinholster* may not apply in Florida.

Circuit precedent both before and after the decision on Mr. Pope's appeal clearly shows that the Eleventh Circuit has applied *Pinholster* such that the undersigned should conduct a section 2254(d) analysis properly limited to the state court record in addition to an evidentiary hearing testing the veracity of Mr. Pope's claims.  *See, e.g., Borden v. Allen*, 646 F.3d 785, 817 (11th Cir. 2011); *Chavez v. Sec'y, Dep't of Corr.*, 647 F.3d 1057 (11th Cir. 2011); *Frazier v. Bouchard*, 661 F.3d 519, 532 n.17 (11th Cir. 2011) ("While *Hall v. Head*, 310 F.3d 683 (11th Cir. 2002), intimates that we may review evidence "adduced in" the federal habeas proceeding, *id.* at 701, such an approach is foreclosed by *Cullen v. Pinholster* . . . . We therefore review only that evidence — both in aggravation and mitigation — produced in the state court proceedings, both direct and collateral."); *Hill v. Humphrey*, 662 F.3d 1335, 1363 (11th Cir. 2011) (J. Tjoflat, concurring); *Guzman v. Sec'y. Dep't of Corr.*, 663 F.3d 1336, 1345, n.12. (11th Cir. 2011) (citing *Pinholster* and stating "our review under 28 U.S.C. 2254(d)(1) is limited to the record that was before the State court that adjudicated Guzman's claim on the merits."); *Price v. Allen*, 679 F.3d 1315, 1324 (11th Cir. 2012); *Kormondy v. Sec'y, Fla. Dep't of Corr.*, 688 F.3d 1244, 1273 (11th Cir. 2012).

Given this backdrop, it is understandable that Mr. Pope argues that an implicit determination regarding the unreasonableness of the Florida Supreme Court's decision was made when the Eleventh Circuit remanded the case for an evidentiary hearing.  This is also a logical assumption because the 2012 Hearing would have been meaningless if the Court were to conclude by denying the claim based on a record that has been in existence for almost 30 years.[4]

---

[4] The Court previously conducted a *de novo* review of Mr. Pope's claims because the parties had stipulated this was a pre-AEDPA petition.  The Eleventh Circuit disagreed and determined "it is undeniable that AEDPA applies here, and Pope has raised no plausible argument to the contrary."  *Pope*, 680 F.3d at 1283.  In remanding, the Eleventh Circuit could have given instructions to conduct an AEDPA deferential analysis of Mr. Pope's penalty phase ineffective assistance of counsel claims pursuant to

Perhaps Justice Breyer articulated the issue best in his concurrence in *Pinholster*: "We cannot say whether an (e) hearing is needed until we know whether the state court, in rejecting *Pinholster's* claim on the basis presented to that state court, violated (d)."[5]  *Pinholster*, 131 S. Ct. at 1412.

Nevertheless, putting aside any logical assumptions that could be made regarding the omission of any reference in the *Pope* opinion to the rule announced in *Pinholster*, for the sake of completeness the Court addresses the merits of Mr. Pope's claim under section 2254(d), with the requisite AEDPA deference accorded the opinion of the Florida Supreme Court.  While the Court agrees with Mr. Pope's position on this narrow issue, given the long and tortured history of this case  — spanning over three decades  — it may be prudent not to assume an implied section 2254(d)(1) analysis was conducted by the Eleventh Circuit when no such analysis appears in the text of the opinion.

### C.    The *Strickland* Standard

The "clearly established law" on the present claims of ineffective assistance of counsel is *Strickland v. Washington*, 466 U.S. 668 (1984).  In *Strickland*, the Supreme Court held that in order to ensure a fair trial, the Sixth Amendment requires defense counsel to provide effective assistance to defendants by "bring[ing] to bear such skill and knowledge as will render the trial a reliable adversarial testing process."  *Id*. at 685.  Where defense counsel renders deficient performance, a new trial and/or resentencing is required if the deficient performance prejudiced the defendant such that confidence is undermined in the outcome.  *Id*. at 694.  To prove prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's

---

section 2254(d) and then, *if necessary*, conduct an evidentiary hearing pursuant to section 2254(e).  It did not.

[5] The Supreme Court also expressly declined to decide "whether a district court may ever choose to hold an evidentiary hearing before it determines that § 2254(d) has been satisfied."  *Pinholster*, 131 S. Ct. at 1411, n.20.

unprofessional errors, the result of the proceeding would have been different." *Id*.

As it relates to deficient performance, counsel enjoys "wide latitude . . . in making tactical decisions" under *Strickland*. *Id*. at 689. Counsel also, however, "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id*. at 691. This duty also includes an obligation to "conduct a thorough investigation of the defendant's background." *Terry Williams,* 529 U.S. at 396;

In the context of a capital case, the prejudice inquiry required by *Strickland* "is whether there is a reasonable probability that, absent the errors, the sentence — including an appellate court, to the extent it independently reweighs the evidence — would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. "To assess that probability, [the Court] consider[s] 'the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the habeas proceeding' — and 'reweig[h][s] it against the evidence in aggravation.'" *Porter v. McCollum*, 130 S. Ct. 447, 454–55 (2009) (quoting *Terry Williams*, 529 U.S. at 397–98).

The judicial "'duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case.'" *Kyles v. Whitley*, 514 U.S. 419, 422 (1995) (quoting *Burger v. Kemp*, 483 U.S. 776, 785 (1987)). In performing this duty, courts "will necessarily" "'speculate' as to the effect" of non-presented evidence. *Sears v. Upton*, 130 S. Ct. 3266, 3266 (2010). The search is for the presence of a constitutional violation and not the absence of one; consequently, the speculation must concern how the non-presented evidence may have benefited a capital defendant's case, not on how the non-presented evidence may have damaged it. *See Smith v. Cain*, 132 S. Ct. 627, 630 (2012) ("The State and the dissent advance various reasons why the jury might have discounted Boatner's undisclosed statements. . . . That merely leaves us to speculate about which of Boatner's contradictory declarations the jury would have believed.").

14

Finally, where, as here, a section 2254 petition is governed by the AEDPA and contains *Strickland* claims that were adjudicated on the merits by a state court, the state court's decision on those claims is entitled to "double deference." *Johnson v. Sec'y, DOC*, 643 F.3d 907, 910–11 (11th Cir. 2011). As the Supreme Court recently explained in *Harrington v. Richter*, when a habeas court reviews an ineffective assistance of counsel claim under the AEDPA, the "state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." 131 S. Ct. 770, 785 (2011). "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Id.* Accordingly, "[u]nder § 2254(d), a habeas court must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Id.* at 786.

At the second step, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786–87. As noted by the Eleventh Circuit, the "[d]ouble deference" envisioned by *Harrington* "is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Johnson*, 643 F.3d at 911. The Court, accordingly, will afford double deference[6] to the Florida Supreme Court's adjudication of

---

[6] There is some doubt about whether a district court should apply "double deference" to the prejudice prong of a *Strickland* analysis during section 2254(d) review because unlike the "initial" level of deference applied to counsel's performance and then the second level of deference given to the state court when evaluating the deficiency prong, here there was no "initial" level of deference given to trial counsel

Mr. Pope's ineffective assistance of counsel claims.

### D.    Section 2254(a)

While a federal district court is restrained from granting a state court prisoner's petition unless section 2254(d) is satisfied, section 2254(a) is yet another hurdle the petitioner must overcome to receive habeas relief.  *See Paige v. McDonough*, No. 3:06-CV-389MCR/EMT, 2008 WL 1844358, at *8 (N.D. Fla. Apr. 22, 2008) (noting that even "if the federal habeas court finds the state court decision to be contrary to, or an unreasonable application of, clearly established Supreme Court law," the court must still "conduct[] an independent review of the merits of the petitioner's claims.").  Under section 2254(a), a district court may only "entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court [] on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  Thus, if it is determined that the Florida Supreme Court's rejection of Mr. Pope's claims was unreasonable, Mr. Pope will only be entitled to relief if he can then prove that he is being held in custody "in violation of the Constitution or laws and treaties of the United States" under section 2254(a).  *See Lopez v. Miller*, No. 02-CV-3988 (NGG), 2012 WL 6027751, at *7 (E.D.N.Y. July 10, 2012) (noting that whereas section 2254(d) "sets forth a necessary but not sufficient prerequisite to habeas relief *only* with respect to claims that were adjudicated on the merits in state court," section 2254(a) "applies to *any* claim raised by a petitioner in custody pursuant to a judgment in state court — whether or not the state court adjudicated that claim on the merits — and permits a district court to grant habeas relief only if the petitioner is in custody 'in violation of the Constitution or laws or treaties of the United States.'") (emphasis in original)

---

in a prejudice analysis.  "Unlike the performance evaluation, which asks us to assess what counsel did or did not do . . . , the prejudice question is, in the end, a legal one."  *Evans v. Sec'y, Dep't. of Corr.,* 703 F.3d 1316, 1334 (11th Cir. 2013) (internal citation omitted) (Jordan, J. concurring).  On the present record, the Florida Supreme Court's decision is unreasonable under either deferential standard of review.

(quoting 28 U.S.C. section 2254(a)).

In making this determination, the Court applies a *de novo* standard of review, "without the deference AEDPA otherwise requires." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) ("When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied.  A federal court must then resolve the claim without the deference AEDPA otherwise requires."); *see Detrich v. Ryan*, 677 F.3d 958, 982, *reh'g en banc granted*, 696 F.3d 1265 (9th Cir. 2012)) (Although *Panetti*'s analysis is addressed to section 2254(d)(1), the court "see[s] no reason why [its] approach should be different where a state court's adjudication of a claim is dependent on an antecedent unreasonable determination of fact" under section 2254(d)(2).); *Lopez*, 2012 WL 6027751, at *11 ("[I]n conducting its analysis under § 2254(a), the court's review is de novo.") (citations omitted).

### E.    Federal Evidentiary Hearings under Section 2254(e)(2)

Federal district courts have discretion to conduct evidentiary hearings on section 2254 petitions subject to the constraints of section 2254(e)(2).   Section 2254(e)(2) precludes evidentiary hearings where a petitioner has "failed to develop the factual basis of a claim in State court proceedings," unless certain conditions are met.[7]  The Supreme Court has clarified that "a

---

[7] Those conditions are as follows:

> (A) the claim [raised in a habeas petition] relies on —
>
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder

failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000) ("*Michael Williams*"); *see Breedlove v. Moore*, 279 F.3d 952, 960 (11th Cir. 2002) ("[A] petitioner cannot be said to have 'failed to develop' relevant facts if he diligently sought, but was denied, the opportunity to present evidence at each stage of his state proceedings.") (citing *Michael Williams*, 529 U.S. at 437).

Whether a petitioner was diligent "depends upon whether the prisoner made a reasonable attempt, in light of information available at the time, to investigate and pursue claims in state court." *Crawford v. Head*, 311 F.3d 1288, 1329 (11th Cir. 2002) (internal quotation marks and citation omitted). At a minimum, "[d]iligence will require in the usual case that the prisoner . . . seek an evidentiary hearing in state court in the manner prescribed by state law." *Michael Williams*, 529 U.S. at 437. Eleventh Circuit precedent further clarifies that when a petitioner has "requested an evidentiary hearing at every appropriate stage in state court and was denied a hearing on the claim entirely, the petitioner has satisfied the diligence requirement." *Pope*, 680 F.3d at 1289 (collecting cases). Once a petitioner has established diligence, a district court must then consider "whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). Thus, a federal court may only grant an evidentiary hearing if the petitioner has "proffer[ed] evidence that, if true, would entitle him to relief." *Hill v. Moore,* 175 F.3d 915, 922 (11th Cir. 1999).

The Eleventh Circuit has already determined that Mr. Pope is entitled to an evidentiary

---

would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

hearing as he "exercised diligence in attempting to develop the factual basis of his penalty-phase claims before the state court," and presented allegations that are so "powerful" as to entitle him to habeas relief if they can be proven.  *Pope*, 680 F.3d at 1289, 1291.

### F.      The Role of Evidence Presented at a Hearing on Section 2254(a) Review

As stated, once the district court has found the state court's adjudication of a section 2254 claim is unreasonable based upon the state-court record, the court must then consider whether the petitioner is being held "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see Panetti*, 551 U.S. at 953.  The question that remains is whether under *Pinholster* newly-presented evidence developed in a federal habeas hearing may be considered in making this determination under section 2254(a).

In addressing this question, the court reasoned as follows in *Lopez v. Miller*:

> *Pinholster* does not preclude a court from relying upon evidence produced at an evidentiary hearing for the purposes of a de novo § 2254(a) determination. *Pinholster*'s analysis was directed entirely toward the language and context of § 2254(d) and the strangeness of "ask[ing] federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court."  131 S.Ct. at 1399.  Moreover, in rejecting the petitioner's argument that the Court's holding rendered § 2254(e)(2) superfluous, the Court noted that "[s]ection 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief."  *Id.* at 1401.  Although the Court raised as example of that "continued force" the situation where a claim was "*not adjudicated* on the merits in state court," *id.* (emphasis added), the same reasoning would logically apply to claims that *have* been adjudicated on the merits by the state court but have *surpassed* § 2254(d), *see id.* at 1412 (Breyer, J., concurring) ("If the federal habeas court finds that the state-court decision fails (d)'s test . . . , then an (e) hearing may be needed.").  After all, although § 2254(d) "focuses on what a state court knew and did," § 2254(a) does not involve any review of a state court's conclusions and does not contain "backward-looking language," *id.* at 1398–99; it applies simply because the petitioner is a state prisoner.  There is nothing "strange" about relying upon new evidence to determine whether a state prisoner is *currently* "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

No. 02-CV-3988 (NGG), 2012 WL 6027751, at *11 (E.D.N.Y. July 10, 2012) (alterations and emphasis in original) (citing cases).  The Court agrees with this analysis, and, in accordance with

the reasoning of *Pinholster*, the language of the AEDPA, and the weight of post-*Pinholster* case law, *see Miller*, 2012 WL 6027751, at *12, concludes that evidence introduced at the 2012 Hearing may be considered in determining whether Mr. Pope is being held in violation of the Constitution or laws of the United States.

### III.    THE RECORD

The Court now turns to the record before the Florida Supreme Court at the time of Mr. Pope's appeal and then to the record developed at the 2012 Hearing.

### A.    The State Court Record

As explained, following the 2012 Hearing, the Court ordered Mr. Pope to file a supplemental memorandum, instructing him to be "clear as to which portions of the record evidence in support of his *Strickland* ineffective claims regarding the penalty phase of his case were in fact before the state court at the time the Florida Supreme Court rendered its decision, with precise citations to the record itself." (Jan. 22 Order 1).  Mr. Pope has identified three specific areas that he argues show the Florida Supreme Court's determination was unreasonable: (1) the allegations in his initial brief to the Florida Supreme Court, (2) the record on direct appeal and (3) the postconviction deposition of his trial counsel.

First, Mr. Pope asserts that he "alleged in his motion for relief in state court that trial counsel failed to present mitigation beyond the standard plea for mercy from his mother[;] . . . that trial counsel 'did little or nothing to develop evidence of such mitigating factors such as defendant's psychological history, performance in the military, or his capacity for rehabilitation and[;] . . . that trial counsel failed to object to prejudicial and improper comments by the prosecutor to the effect that Petitioner would prefer to receive the death penalty."  (Pope Mem., 9-11) (internal quotation marks and citations omitted).

CASE NO.  91-6717-CIV-ALTONAGA

Second, Mr. Pope argues that the record on direct appeal shows "there was nothing presented at the penalty phase other than a paltry two pages of slapdash testimony from Petitioner's mother (involving no more than three substantive questions from Mr. Eber), containing the following points of actual information: Petitioner returned from the war not the same and 'disappointed [] in his country, the government, . . .  people, [and] in justice;' a request for mercy and to 'just look at him like he'd be your son;' and his mother's opinion that she 'believe[s] he is innocent.'  That [was] the entirety of the mitigation case presented by Mr. Eber." (*Id.* 9) (internal citations omitted; alterations in original).  Mr. Pope also contends that the record shows "trial counsel put on no evidence beyond the short-lived testimony of Petitioner's mother, and that trial counsel's brief four pages of actual argument at the penalty phase contain absolutely no mention of military service, psychological or mental health issues, or capacity for rehabilitation. The closest thing to a reference to any of these issues is trial counsel's vague and meaningless comment that Petitioner 'went through some experiences that had a profound effect on him' by 'chang[ing] his personality forever.'  (*Id.* 10) (internal citations omitted; alterations in original).  Mr. Pope's "citations to the record" conclude with him advising the Court that "while trial counsel requested a mental health expert by motion, the expert was only requested to assist with the guilt phase question of competency and was not requested to look into any of the glaringly obvious mental health issues arising from Petitioner's wartime experience and drug abuse;" and that, without objection, "the prosecutor told the jury during the penalty phase that 'Mr. Pope has announced that he would rather receive a death penalty than life imprisonment.'" (*Id.* at 10-11) (internal citations omitted).

Mr. Pope also cites trial counsel's deposition which "reflects that [sic] Eber stating that he did not recall doing any investigation into mitigating factors, talking to Petitioner's mother or any family members, finding out about Petitioner's childhood, or employing an investigator."

CASE NO.  91-6717-CIV-ALTONAGA

(*Id.* at 10) (internal citations omitted).  Mr. Eber testified at a video-taped deposition on August

20, 1987 regarding the penalty phase investigation as follows:

Q: Do you recall doing any investigation about any mitigating factors?

A: Specifically, no.

Q: Did you ever talk with his mother, for instance?

A: I don't recall.

Q: Did you ever talk with any members of the family?

A: I don't recall.

Q: Did you ever find our about his childhood?

A: I do not recall.

           \*         \*         \*

Q: Did you ever employ an investigator?

A: No.

Q: Why not?

A: Well, who was going to pay for it? There was one particular situation in which I requested some funds for an investigator from the Court, and I was told I could spend - - I don't know - - a few hundred dollars.

Q: Three hundred?

A: I don't remember specifically what was involved, other than - - whatever it was became known to me, and *I never employed the investigator*, but I was not in a position to have carte blanche, to have an investigator going around talking to all those people?

Q: Do you think that would have been helpful?

A: I think that had I funds available to do it, I would have done it. Whether it would have been helpful or not, I couldn't tell you.

Q: Because you don't know what those people had to say?

A: That's right.

Q: Did you ever make any effort to contact the PD's to see if they could have one of their investigators talk with anyone?

A: I don't believe so.

Q: Did you ever let the Court know that you needed an investigator, and you required more than three hundred dollars in order to do the things that you thought would be necessary?

A: No, I don't think I did, and I may have been assuming something that I shouldn't have assumed, but it was my assumption or feeling that those funds were not available anyway.

(State Court Record ("State Record"), Ex. D, Vol. II of III, 144, 154-55 [ECF No. 40])[8] (emphasis added).  Mr. Pope's characterizations and citations are generally accurate.[9]  The Court's focus is not limited solely to what is in the record but rather to what is not in the record.[10]

The penalty phase of Mr. Pope's trial began on February 25, 1982 at 7:47 p.m., immediately following the guilty verdict.  (*See id.* Ex. A, Vol VI of VII, 98 [ECF No. 34]).  The entire penalty phase proceeding encompasses 32 pages of transcript: one page of Mrs. Pope's plea for mercy; three pages of Mr. Eber's argument; and the remaining 28 pages of the State's closing argument, the court's instructions to the jury, the jury's recommendation and the polling of jurors after their vote.  (*See id.*).

_____

[8]  The Court uses the pagination assigned by the Court's CM/ECF Case Management System.

[9] The one exception to this is the scope of the expert witnesses' examination.  While the purpose for the motion to appoint an expert was to determine competency, the motion also asked for the expert to determine "whether the defendant was legally sane at the time of the alleged offense," "whether the Defendant knew the difference between right and wrong at the time of the alleged offense," and "whether the Defendant knew the nature and consequences of the act if committed as alleged."  (State Court Record, Ex. A, Vol. VII of VII, 48-49 [ECF No. 35]).  However, none of these issues necessarily went to mitigation nor did Dr. Weitz ever testify at the penalty phase.

[10] The absence of evidence is also relevant to the section 2254(d) analysis.

The subsequent *Spencer* hearing[11] was even more abbreviated.  It encompasses less than 25 pages of transcript.  Mr. Eber's words appear on 6 pages of transcript.  For the first time, Mr. Eber raised Mr. Pope's military service and his Post Traumatic Stress Disorder ("PTSD") to the judge. (*See id.* at 138).   The Florida Supreme Court declined to hold an evidentiary hearing to ascertain whether or not this was a strategic or purposeful move on Mr. Eber's part.  It was on this record that the Florida Supreme Court made its determination that Mr. Pope was "conclusively" entitled to no relief.

### B.        2012 Evidentiary Hearing

### 1.        Mr. Pope's Witnesses

At the 2012 Hearing, Mr. Pope presented testimony from neuropsychologist Dr. David Price, psychologist Dr. William Weitz, mitigation specialist Steven Gustat, and Mr. Pope's trial attorney, Scott Eber.

### a.        *Dr. David Price*

Dr. David Price has extensive experience as a clinical and forensic psychologist and neuropsychologist.  (*See* T. Vol. 1 at 1–5 [ECF No. 181]).  He has received specialist training, has extensive experience working with sufferers of PTSD, including combat PTSD, and has published extensively on PTSD.[12]  (*See id.* at 1–6).  Dr. Price evaluated Mr. Pope in 1991 at the request of Mr. Pope's then-postconviction counsel, Alan Wagner, paying particular attention to disorders that could serve as mitigating considerations. (*See id.* at 9–11).  Dr. Price's evaluation consisted of a five-and-a-half-hour, face-to-face interview with Mr. Pope, a consultation with

---

[11] *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

[12] Dr. Price has also published on the issue of malingering and on psychological injury claims.  (*See* T. Vol. 1 at 1–7).

psychiatrist Alec Whyte, who had also evaluated Mr. Pope, and a review of records.[13]

As a result of his comprehensive evaluation, Dr. Price uncovered facts surrounding Mr.

Pope's physically and emotionally impoverished childhood:

> Mr. Pope was born in western North Carolina. He came from a large family.  He was the youngest of nine children.  His family were [sic] cotton mill workers, textile mill workers. I believe only one of the nine children completed high school.

> > \*                      \*                      \*

> [T]he family was preoccupied with survival, if you look at how they lived. In clothing nine children, the daughters wore flour sackcloth dresses . . . the mother made. They had hand-me-downs.

> > \*                      \*                      \*

> They did other things, such as raise garden and raise livestock to feed the family.

> > \*                      \*                      \*

> They initially didn't have indoor plumbing. They [] lived in a house and [] took baths outside and had an outside bathroom.

(*Id.* at 12–13).  In that impoverished environment, Mr. Pope's childhood was characterized by a

lack of nurturing:

> [T]his family was preoccupied with survival. There wasn't a lot of physical affection. People didn't tell -- it wasn't like the "Waltons," people didn't tell everybody good night and kiss them good night and tuck them in.

---

[13] The records reviewed are of the type normally relied upon by psychologists in conducting forensic evaluations and in forming opinions.  Specifically, the records reviewed included the opinions expressed in Mr. Pope's state court proceedings, Dr. Weitz's evaluation of Mr. Pope, trial testimony, summaries of interviews with Mr. Pope's friends and family, school records, Social Security records, military records, Vietnam command chronologies for Mr. Pope's regiment, literature on Vietnam, recorded statements of Mr. Pope, crime scene reports, the sentencing order of the trial court, Florida Department of Correction files on Mr. Pope, Mr. Pope's birth certificate, police reports on interviews with Mr. Pope, depositions and medical records.  (*See* Def. Ex. A, 1–2 [ECF No. 180-1]).  The materials reviewed were admitted into evidence as Defense Exhibit G.

CASE NO.  91-6717-CIV-ALTONAGA

> The parents weren't physically affectionate, certainly in front of the children.

> \*              \*              \*

> They were religious. As many are in that area, they were Southern Baptist and were pretty strict Southern Baptist. They lived by the Bible.

> \*              \*              \*

> It was a firm, fundamental kind of family to grow up in.

> \*              \*              \*

> There was corporal punishment. And the instrument of choice was a razor strap applied to the buttocks.

(*Id.* at 14–15).

Following this difficult childhood, Mr. Pope enlisted in the Marines at the age of 18.  (*See id.* at 15).  Despite suffering an injury in which he lost part of one finger, Mr. Pope declined the offer of a medical discharge and was sent to Vietnam as a rifleman.  (*See id.* at 16).  In Vietnam, Mr. Pope was first involved in search-and-destroy missions, including two major counterinsurgency operations in Quang Tri Province — Operations Purple Martin and Herkimer Mountain — before being transferred to the rear supply, where he was subjected to regular mortar attacks.  (*See id.* at 16–17).  Dr. Price made clear that Mr. Pope was involved in heavy combat (*see id.*), and he chronicled the toll this heavy combat had on Mr. Pope.  Mr. Pope turned to the use of illicit drugs in Vietnam and afterwards, involving first marijuana and then LSD and cocaine, which Dr. Price described as "not uncommon with the troops back then."  (*Id.* at 17–20).

Dr. Price explained that when Mr. Pope returned from the bloody combat he faced in Vietnam, he was not greeted kindly or given support to deal with the psychological trauma he had experienced:

> You know, one of the differences between when we brought our troops back from World War II and Korea, we tended to bring units back, and so they had

> support groups.  Particularly World War II, they would come by shipside for several days or weeks and have the support of their comrades in arms. In Vietnam they got plane rides home, often solitary, and didn't have that support.
>
> Coming back just stateside, it was an unpopular war. People that had fought there were exposed to people that criticized them or made fun of them . . . .

(*Id.* at 17–18).  Returning to that painful environment, personal relationships were difficult for Mr. Pope.  Mr. Pope's post-Vietnam relationships were "somewhat sporadic and sort of non intimate."  (*Id.*).  Dr. Price described the decline in Mr. Pope's functioning during the period following his return form Vietnam as a "prodromal period" before developing a full blown mental disorder:

> [A] prodromal period is when a person starts to decline before they get the full-blown mental1disorder.  And you can see a decline in their functioning.
>
> And what we see in Mr. Pope during that period in the '70s was a decline in his functioning and increase in drug usage and other problems that he had.  So you can see the decline prior to his marriage.  And after his marriage that decline quickens -- after his divorce that decline quickens.
>
>            *                *                *
>
> [H]e ended up selling drugs to support his drug habit. And one of the things that ultimately led is, he started using cocaine, was it led to decline, probably, in his best job at a Buick car dealership, and it was his cocaine dependency.
>
>            *                *                *
>
> He went from using cocaine to using incredible amounts of cocaine.  I've seen -- I can't tell you how many patients I've seen in my career.  This is the only case I've seen where someone would line up a line of cocaine on a six-foot mirror and do the whole thing themselves [sic].
>
>            *                *                *
>
> He took a significantly large amount of cocaine.

(*Id.* at 19–20).

In addition to Mr. Pope's drug use and difficulty with personal relationships, Mr. Pope began to exhibit several bizarre behaviors that might suggest PTSD:

CASE NO.  91-6717-CIV-ALTONAGA

And one of the things that gets lost when you look at Mr. Pope is, . . . like a number of veterans that have significant problems, they end up being homeless.

You know, Mr. Pope might have had a home base in North Carolina and certainly had time in Florida, but he never had a place of his own. He lived in friends' houses like the house at Lake Wylie, that became a base of operations for him, was somebody else's. When he came down to Florida, he stayed in a hotel or he stayed in an attorney's apartment.

He was, literally, the loss of one vehicle away from being homeless and on the streets.  And that's real common with these people of drug dependency and not being able to maintain a job.

He started showing problems of posttraumatic stress disorder in some of the behavior that he would clearly show and has been reported by others around the Lake Wylie home.

. . . Lake Wylie is a lake in South Carolina that has a lot of rural land around it. And this particular home, as described, was sort of in the woods, isolated from others. And he started having dissociative experiences, and he started showing some paranoia from the past.

He developed a tunnel system around and under the house at Lake Wylie, very similar to the tunnels that they had to deal with North Vietnamese and the North Vietnamese bunker-type system. He'd have these dissociative experiences where he was always coming back. He was always fascinated with guns and, I think, at one point reported he had 43 guns.

[B]eing armed is a significant thing for vets. I've evaluated a number of vets home from Iraq and Kuwaiti [sic]. And they'll report when they're over in combat zones and wearing body armor and carrying their guns, they feel safe and not necessarily show full-blown PTSD. They come back to this country and they can't drive around with .50 caliber machine guns on their car, wearing full Kevlar and carrying guns, then they start showing significant signs of anxiety and hypervigilance and things that we associate with posttraumatic stress disorder.

He started doing some bizarre things. Like he would dress down in fatigues and paint his face with camouflage and take a weapon and go out in the woods on a search-and-destroy mission, and could be gone anywhere from hours to days. . . .

He had the tunnel system as an escape. People report that he had the entrances to the house booby trapped. And if you went there to visit him, you had to call him ahead of time so he could guide you to the home. He, sort of, invented, like, he has his house back in the jungle and he's doing these things for self-protection.

(*Id.* at 21–23).

28

Dr. Price applied the diagnostic criteria from standard diagnostic manuals, both the DSM-III and the DASM-III-R, in forming his opinion as to Mr. Pope's mental condition, because the DSM-III-R was current at the time of his evaluation in 1991 but the DSM-III was the applicable standard at the time of Mr. Pope's trial in 1982.  (*See id.* at 28).  Dr. Price testified that Mr. Pope met the criteria for PTSD under both definitions without malingering his symptoms.  (*See id.* at 30–31).  The MMPI test administered by Dr. Price resulted in a finding that Mr. Pope did not malinger during his evaluation (*see* Def. Ex. A), and Mr. Pope's average score on the WAIS-R intelligence test supported that conclusion.

In addition to the diagnosis of PTSD, Dr. Price concluded that in 1981 Mr. Pope would have met the diagnostic criteria for cocaine dependence; sedative, hypnotic or anxiolytic dependence; and organic delusional disorder or cocaine delusional disorder.  (*See* T. Vol. 1 at 34). Dr. Price testified as to the effect of cocaine on someone already suffering from PTSD:

> . . . [D]ual diagnosis patients are very problematic. And most individuals that we see with PTSD will oftentimes have another substance abuse problem, almost like it's self-medication or -- the combat veterans learn to do it in -- in combat as a way of reducing stress.
>
> And, you know, the thing about cocaine, it's like taking a stimulant continuously. And we can see people that actually develop almost a schizophrenia-type thing with habitual use of stimulate-type things.
>
> The thing I want to mention about cocaine is it, you know, you take somebody that has a significant mental disorder and then you start putting toxins in them that affect thinking, planning, comprehension, inhibition of behavior, impulsiveness, and things of that nature and it exacerbates it.  And you get an outcome where an individual can act very erratically and unpredictably.
>
> And so the other problem is when you do something like cocaine, you almost get manic. You don't sleep. You look for sensory-stimulating things, such as people have heightened libidos and things of that nature. The lack of sleep then creates problems.
>
> People that do cocaine can develop a paranoia. They can be very aggressive. They can be emotionally labile, meaning their emotions shift without any reasonable or predictable reason or purpose.  They can lash out unexpectedly.  I

mean, it really is a -- it really is a stiffly problematic drug.

You know, the veterans -- or anybody with posttraumatic stress disorder that become dependent on alcohol or cocaine, crack, something like that, they become aggressive.

(*Id.* at 35-36). Dr. Price further explained that the behavioral effects of PTSD become exacerbated by drug usage:

It's like throwing gas on a bonfire. . . . [D]rugs . . . are toxins.  And you start putting toxins in your body and you start mixing the toxins in your body, they start to affect your cognitive processing and certainly start impairing your social judgment, your behavior.

[What] . . . separates us from animals is that we have frontal lobes. And the frontal lobes help us with planning, organization, social judgment, social inhibition, and things of that nature.

You start putting drugs in there and it starts inhibiting the function of the frontal lobes, and their behavior is not inhibited, their social judgment is poor. You might see the language is coarser than it would have been otherwise. They overreact. They're inappropriate. . . .

(*Id.* at 41–42).

Dr. Price also described the effects of PTSD on behavior:

Posttraumatic stress disorder is -- people that have depression -- and about 70 percent of the people that have posttraumatic stress disorder also have a major depression, because it's such a miserable way to live.

But if you have major depression, it permeates every aspect of your life which is why it's called major. But you get used to it. And people are remarkable about habituating themselves to their circumstances and it becomes normalcy for them.

People with anxiety disorders can't do that because you never know when you're going to have a panic attack and you never know when you're going to lose control.  You actually have more suicides on anxiety disorders . . . than you do depressive disorders. . . .

And what happens with posttraumatic stress disorder is you begin to act irrationally . . . [W]hen we were studying Psychology 101 and they talked about Pavlov's dog salivating to the bell, the appearing of the food and the bell would cause the psychological -- psychophysiological reaction of salivating, getting ready to eat. That's actually what happens with posttraumatic stress disorder.

(*Id.* at 36–37).

Dr. Price addressed the effects of PTSD on cognitive functioning and judgment as follows:

> Well, . . . with PTSD . . . because of the avoidance, you have less public functioning. . . . You can have a diminished interest in activity, so you do less, you isolate yourself more.
>
> You can have things like hypervigilance which is . . . common to posttraumatic stress disorder.  Hypervigilance is really being on edge the whole time and very jumpy, exaggerated startle reflex. . . .
>
> And hypervigilance was probably a part of -- along with dissociation, with him dressing up in camouflage and carrying a weapon. And some of that fearfulness probably led to his fascination of the weapons.  And, again, at some point he said he had 43 guns.
>
> . . . [I]t affects judgment, insight, cognitive functioning, perception. One of the things that happens in proceedings like this one is that we're looking for rational explanations of why people do irrational things. And that's very difficult to do in significant mental disorders, because . . . each individual with a mental disorder is so different, they bring different things to the table and you add drug usage to that.
>
> . . . [T]hey don't read social cues the same way. They just don't see reality the same way you and I see it. . . .
>
> So it really affects that. . . . [P]eople with PTSD often end up doing impulsive things that we []can't figure out why they're doing it. Changing of residences or changing of activities or destroying all their momentos [sic] of their military service, or things like that. I mean, they really can become impulsive. Again, you know, anxiety is coursing through them. They can have difficulty remembering things.  They can have difficulty in concentrating.
>
> They can have what we call "emotional ability."  And disorders that have emotional ability often wind up in some type of criminal settings because people overreact, emotionally overreact to events most of us wouldn't get upset about or we don't have our emotions shift at the drop of a hat dramatically.  And you can see that in a PTSD case.
>
> . . . If you look at his record, one of the things Mr. Pope did, is he started having this nomadic lifestyle where he'd change residence. . . .  I mean, really, he was a high-functioning homeless person in the sense that he had some places he could go to, but he didn't have a home.

(*Id.* at 39–41).

Dr. Price stated that Mr. Pope's psychological state was such that Mr. Pope met the criteria for two statutory mental health mitigating circumstances: he was under extreme mental or emotional disturbance at the time of the crime, and his ability to conform his conduct to the law was substantially impaired at the time of the crime. As to extreme mental or emotional disturbance, Dr. Price explained,

> . . . I feel that the combination of the PTSD along with the cocaine dependence and the organic delusional disorder and the sedative use certainly was . . . giving him a significant disabling impact on his ability to think, reason, and plan.

> The . . . capital . . . felony was -- occurred when I felt he was under extreme mental and emotional disturbance. And that would include the organic delusional disorder, cocaine delusional disorder, could possibly include cocaine delirium.

> When you've done so much cocaine, when you talk about the volume of cocaine, delirium is that their behavior -- everybody recognizes that they have a significant mental disorder. These are the kind of people that you try to put in a straightjacket and commit them when you see somebody with delirium. And then his use of the sedative simultaneously to buffer the effects of the cocaine. We predispose him to react in irrational, combative and violent ways with just no appreciation for the consequences.

> You know, we're talking about an individual that at one point saw his reflection in the mirror and shot it, thinking it was an intruder. And, then, one of the problems with individuals that have these kind of disorders that also feel the need to carry guns or, like veterans, it's a bad mixture.

> And . . . any of these disorders by themselves could cause him to . . . overreact in violent and unpredictable ways. Mix them all together and it's a mighty bad stew. I mean, there's [sic] some significant problems.

> When people have delusional disorders and sometimes the delusional disorders, a layman doesn't realize the person is delusional, because some of what they're delusional about may seem to be reasonable. But when you're under a delusional disorder, anything they do appears to be justifiable under the context of the delusion. They feel that they're reacting in appropriate ways to a threat in the environment.

(*Id.* at 42–44).

With regard to the existence of the mitigating factor that Mr. Pope's capacity to conform his conduct to the law was substantially impaired, Dr. Price testified:

CASE NO.  91-6717-CIV-ALTONAGA

> I thought he was under the influence of significant drugs that he was physically and psychologically addicted to.  I think the use of the drugs and the long usage of the drugs contribute[d] to an organic mental disorder which could cause him to react in violent and unpredictable ways.
>
>     . . . [T]his is [a] man that had no prior history of violence prior to his experience in Vietnam and subsequent use of drugs and decline. . . . [T]hese factors affected his critical judgment, the perception of others, and his interactions with others. . . .
>
> *          *          *
>
> I think his judgment was impaired to a substantial degree.

(*Id.* at 44).

Dr. Price opined that Mr. Pope was incapable of forming a heightened level of premeditation for the crimes: "I think this man didn't plan anything. And I certainly think that his capacity to plan . . . anything out was affected by his posttraumatic stress disorder, drug usage, and delusional disorders."   (*Id.* at 45).   Dr. Price also noted that his conclusions were "remarkably consistent" with the conclusions of Dr. William Weitz, who had evaluated Mr. Pope a decade earlier in 1982.  (*Id.*).

> b.     *Dr. William Weitz*

Dr. Weitz, the psychologist who worked on the guilt phase of Mr. Pope's capital trial, also testified at the evidentiary hearing. At the time of Mr. Pope's trial, Dr. Weitz had extensive experience working with and treating Vietnam veterans with PTSD at the Department of Veterans Affairs.  (*See* T. Vol. 2 at 19 [ECF No. 182]).  Dr. Weitz was approached by Mr. Pope's original lawyer, Douglas McNeil, in 1981, but did not do any work on the case until February 1982, when Scott Eber asked him to evaluate Mr. Pope.  (*See id.* at 21).  Dr. Weitz performed a face-to-face evaluation several days before the trial, but was not provided with much background information relating to Mr. Pope:

> One of the issues, then, that manifested was the fact that I had, in terms of

CASE NO. 91-6717-CIV-ALTONAGA

background material, I got some -- a few pages. And mainly it was a . . . military DD-214 which is a summation. It's a military form summarizing the veteran's time in the military with critical information. And then some information around the charges, the probable cause, things of that nature.

. . . [T]he material I received was sketchy and limited, and not nearly the kinds of records, background information, data that I normally require, even at that time, in terms of getting validating and other records information to help me in my evaluation so that I'm not so relying on self-report of the defendant.

(*Id.* at 23–24).

Dr. Weitz did not spend any significant time with Mr. Eber in preparation for his testimony. (*See id.* at 24). The scope of Dr. Weitz's evaluation was to look at competence and sanity (*see id.* at 25):

At no point was I -- either in court order or in discussions with attorneys, either attorney -- asked to evaluate the defendant with respect to either statutory or nonstatutory mitigation issues which may be relevant in sentencing. . . .

I'm aware that I was requested, by the attorney and the judge granted, to testify in the guilt phase of the trial. But certainly the materials and information that were identified through the evaluation certainly had meaning and relevance to a penalty phase component of the trial. But I was never asked . . . to submit any material that would go towards mitigation issues.

(*Id.* at 27). Based on Mr. Pope's self-report and Dr. Weitz's review of the few records supplied to him, Dr. Weitz diagnosed Mr. Pope with PTSD as defined by the DSM-III. (*See id.* at 29). As a result of his observations, Dr. Weitz described Mr. Pope as unemotional and detached:

Given that Mr. Pope presented as a very controlled, detached individual, and that relatively is standard in my experience in terms of . . . combat veterans wanting to maintain tight control over their emotions and not show emotional expression. But it also is true that -- and this was towards the middle-end of the interview. So there was [sic] a number of hours that had transpired. This did not happen at point one, two, or three of the interview. This was well into the interview.

When we started to discuss and relate information about his Vietnam experience, at certain points that level of control, that level of ability to maintain his defense structure broke and he became highly emotional and highly tearful and upset and distraught as he tried to deal with the subject matter we were discussing.

34

. . . [E]arly in my clinical experience I used to hear from lots of people in terms of this controlled affect, that combat veterans don't feel, okay? And I soon learned, after many years of experience, they feel intensely, they just don't show it.

(*Id.* at 33).

Dr. Weitz discussed the psychological effects of Mr. Pope's combat experience:

Both the reaction and . . . the content of the subject matter indicated to me that Mr. Pope indeed, as a U.S. Marine in Vietnam, had been exposed to multiple episodes of high combat stress . . . he had gone through significant military operations where he, himself, was exposed to atypical stressors. Basically, meaning combat, death and dying, destruction. And that he, indeed, had a behavioral pattern and a -- the criteria for a posttraumatic stress disorder was consistent with the way he learned to survive and cope with this.

And the affect that was displayed at those critical times validated which kinds of experiences were the most upsetting and significant in terms of that combat exposure.

(*Id.* at 34).

Dr. Weitz testified that in 1991 he received additional materials from Mr. Pope's postconviction attorneys which confirmed the self-report given by Mr. Pope in the 1982 evaluation. (*See id.* at 37). Dr. Weitz described the information he obtained from the DD 214 form:

Mr. Pope entered the United States Marine Corps . . . with a delayed status, meaning he entered and then officially was activated a short time later. That he spent time both stateside and training, Parris Island, Camp Lejeune, Camp Pendleton; normal training for Marines. . . . [A]nybody that went to Pendleton was going to Nam. That's where they did the special jungle training and military training. And by and large most Marines who were enlisted, privates were going to Vietnam. And he knew it.

. . . [H]e did have overseas service. . . . [H]is overseas service was a year. . . . It indicates that medals that he received was Vietnam service and campaign medals, so that indicates his tour in Vietnam.

Also . . . it indicates he received a rifle marksman badge. . . .

*             *             *

CASE NO.  91-6717-CIV-ALTONAGA

He was trained. He was a trained marksman with weapons. Here it indicates rifle, okay? And meaning that he was -- he was a sharpshooter. . . . He had to achieve a certain level of performance, a high level of performance to be recognized for this medal.  So he was a marksman.

. . . [H]e had the rifle marksman's badge, good conduct. Meaning he didn't get into major difficulties or disruptions or trouble. And, also -- and that he did receive, in a normal fashion, move from E-1 to E-3 in normal progression. His rate of promotion was reasonable and normal for the time period that was established.

(*Id.* at 40–41).

Dr. Weitz described Mr. Pope's combat experiences before he was transferred to the rear:

Setting up ambushes for the enemy. Search-and-destroy missions where they go out and patrol and look for the enemy and try to establish contact. Intelligence missions where small units -- small squad-sized units would go out and try to capture enemy combatants for information -- alive so they could gather information and intelligence.

So you're talking about a traditional role of the United States Marine Corps, front line combat person.  Where we're talking about front line direct, hands-on combat experience, events, close proximity to enemy, as is described by so many combat veterans. The experience of Vietnam with days and days of boredom followed by brief moments or days of intense excitement and chaos.

(*Id.* at 46).

When Mr. Pope was later transferred to the rear, he did not experience any relief from the

horrors of combat:

He may not be in a front line unit doing the search and patrol missions, doing the search and destroy, doing some of the kinds of first -- you know, in terms of the geography, being closer to enemy positions.

But as most who have studied and learn about Vietnam know, that there was no safe area. . . . [T]he rear areas, as defined, were as exposed to death and dying and mortars and combat . . . . There was no front line.

The fact that he was in a -- more of an administrative supply or detail unit, basically, may have actually put him in more contact with bodies.  Because the air fields that were identified in the rear, a lot of the guys had to deal with the deceased and moving bodies out of country back to the United States.

36

. . . [M]any of those individuals also participated in extra activities that are not in military records. But, for example, serving as extra helicopter dog gunners when the helicopters went out to deal with troops that were caught in an ambush or firefight.  So the fact that he was in the rear did not minimize, lessen, or reduce his combat exposure.

(*Id.* at 43).

Mr. Pope was subjected to frequent mortar attacks and witnessed the gruesome deaths of

friends:

And he talked about the loss of a few good friends. What he was talking about is that the mortars hit, and he turned around and saw bits and pieces of his friends lying on the ground, you know, by him. That's what a mortar attack is about. And the fact that he lives means he survived. . . . Not only does he witness and -- exposed to death and dying and disintegration of humans, but he also now has the -- the misfortune of experiencing survivor guilt because he lived and his buddies died.

(*Id.* at 45).

Dr. Weitz described the interrelatedness of Mr. Pope's substance abuse and his PTSD:

Let me simply add that it's important that one not see drug use, alcohol, and substances, as separate and discrete components of separate illnesses when you're dealing with combat vets. I'd say 70 to 80 percent of combat vets that came back had major alcoholic and drug problems. It was a part and parcel of combat experience and the reaction to combat.

. . . [W]hen we dealt with combat veterans in treatment, getting alcohol/drug treatment as part of their comprehensive care was a must. . . . It wasn't a separate illness. It was part and parcel of the way they cope with that experience.

(*Id.* at 50).

Dr. Weitz described the sense of alienation and dejection felt by Mr. Pope on Mr. Pope's

return from Vietnam:

[H]e became much more aware of the political unrest with regard to the war, the antiwar sentiment, the hostility towards the combat soldiers that were fighting there.  Basically,  . . . baby killers, war mongers, getting spit on in airports and bus stations when they're in uniform upon return.

When he started to recall and relate about -- specifically I talked about "became more angry at the antiwar sentiment and protests escalating in the United

States," it generated significant tearfulness. . . .  [I]n my professional opinion, that tearfulness had to do with the very loss of innocence that our soldiers had upon giving all they had and then returning to an ungrateful country.

(*Id.* at 51–52).

When asked about whether Mr. Pope's feelings of not fitting in after returning from Vietnam were unique to Mr. Pope, Dr. Weitz explained:

No, sir. . . . [I]nvariably, in discussions with Mr. Pope, but with so many veterans, the war experience changed them greatly.  But in their minds, they were the same, and when they returned, the environment and the people in it were different.

So there was a distortion. They just didn't recognize where the distortion took place. And in their minds, they didn't fit. But it was their friends and family and environments that had changed, they were the same. Of course, we know that's not the case.

(*Id.* at 52).

Dr. Weitz described how Mr. Pope fell into a transient and destructive lifestyle upon his return from Vietnam:

Nomadic lifestyle, transiency, variety of jobs, moving from job to job, lack of stability in relationships both with family and friends and others. . . . [L]iving for today with no real future orientation or no plans for long-term future.

Certainly this nomadic, transient lifestyle often including drug use, alcohol/drug use which escalated. And . . . that sense of trying to recapture or look for that adrenaline high from combat which, you know, I kind of relate, I talk about high-risk behaviors.

So that style -- that lifestyle permeated his return. And I think where it's critical, as part of the PTSD diagnosis, is that there's depression, rage reaction, inability to establish intimate close relationships with others, and hyperarousal and hypervigilance, which really talks about a physiological reactivity to noise, sights, sounds. So those components are characterized in that lifestyle and behavior style that was exhibited by Mr. Pope in the years after his return.

(*Id.* at 53–54).  Mr. Pope reported he had difficulty in sleeping, which is another common symptom in sufferers of combat-related PTSD:

The combat veterans don't sleep because they don't want to dream. That's where the memories and the events from combat start to recall and they don't

have control over it. So it's not uncommon that sleep is a major problem.

One of the treatments for that particular symptom that the VA and others utilize is medication, because that's not amenable to, in my professional opinion, to just verbal or conversational behavioral therapy.

So there's a lot of sleeplessness, depression. The alcohol and drugs, of course, impact on his eating routine and, you know, obviously, there would expect some weight loss, whatever. . . . There's no stability in lifestyle upon return.

(*Id.* at 54).  Dr. Weitz noted that Mr. Pope sought assistance at a Vietnam outreach program, but

that it did not work out.  (*See id.* at 56).

Dr. Weitz explained that the additional materials he received in 1991 did not change his

opinion as to Mr. Pope's PTSD, but rather validated Mr. Pope's self-reporting.  (*See id.* at 58).  In

particular the command chronologies relating to Mr. Pope's unit provided specific information

relating to the combat operations Mr. Pope was exposed to:

The command chronologies listed the specific operations, the locations, the purposes of the operations.

If you want to talk about death and dying, high rescue, life being uncertain, survival being an issue, trying to protect each other, your buddies, and get them out of harm's way, those were the operations that were significant in terms of that timeframe.

We're talking about the Vietnam -- not of the 1972, '73s. We're talking about Vietnam in the '60s, and we lost too many lives.

(*Id.* at 66).  When asked whether the information in the command chronologies, which covered

Mr. Pope's regiment and company during the period that Mr. Pope was in Vietnam, were useful

in his examination, Dr. Weitz explained:

Certainly it reinforced my initial and follow-up diagnosis of posttraumatic stress disorder, chronic and delayed.

As I indicated, I prefer to have, when available, documents, records, materials that can supplement and reaffirm any clinical determinations I'm making, either through interview or through psychometric evaluation. And these are the kinds of materials that would provide that support and baseline.

(T. Vol. 3 at 19).

As a result of his review of the additional materials in 1991, Dr. Weitz did not change his

diagnosis of PTSD, but he did raise some additional issues involving Mr. Pope's use of drugs and

alcohol:

> I was aware at the time of interview of Mr. Pope about use of substances during Vietnam, in Okinawa, and upon return, and then subsequent to his military life as a civilian.

> I was not aware at that time of the diversity and the vast array of drugs that he had used following his discharge from service, the frequency and intensity. And, essentially, the fact that alcohol and drugs and -- primarily began to control and rule his life. . . .  The records that I reviewed, a lot of the family and friends' statements, et cetera, provided detailed information about that aspect of his functioning.

> And, as I said, I didn't diagnose it separately because I was at that time aware that alcohol/drug use was a critical part of a PTSD reaction. It wasn't that I was denying the use, but that it was a component of traumatic stress reactions.

> In retrospect, given the amount of use and the intensity, when you look at the potential for organic components and delusional components, I think that providing separate diagnostic categorization would be appropriate.

(*Id.* at 29–30).

Dr. Weitz testified that even without the additional materials he was provided in 1991, he

would have been able to testify to the existence of statutory and non-statutory mental health

mitigation at Mr. Pope's penalty phase had he been asked to do so:

> [W]ell, you're dealing with issues of an impoverished home environment.  You're dealing with the fact that he was a military veteran, a combat veteran. You're dealing with the fact that he has earned medals and citations as a combat veteran. You're talking about his relatively young age and potential for rehabilitation, as I indicated.

> He had always worked throughout his life before the military. And after -- and then, of course, he got into the drug involvement. But he had always been a worker and a -- kind -- contributor and he had a high level of intelligence.

> There were -- also, I must point out, that in his entire history -- excuse me,

combat, of course, there is no evidence of any kind of -- with the exception of the offense for which he was convicted and is now serving time. There was no volatility or aggressive or violent behavior in his entire life. In fact, for the most part, people talked about a different style of interacting as opposed to aggressive.

So there were lots of information and psychological relevant issues they could have presented in a mitigation, notwithstanding the severity of the charges and the significance, but certainly that should and could have been presented at a mitigation.

(*Id.* at 36–37).

### c.  Stevan Gustat

Mr. Gustat is a criminal defense investigator and mitigation specialist who has performed numerous criminal defense investigations for various state and private agencies.  (*See id.* at 98–100).  He practiced in Florida at the time of Mr. Pope's trial and is familiar with the standards for defense investigations at that time.  (*See id.*).  Mr. Gustat explained that routine mitigation investigations will cover the circumstances, medication and potential substance abuses of the parents of the defendant prior to the defendant's birth and during pregnancy; the circumstances of the defendant's upbringing; and gathering any and all available records, such as medical records, school records, work records, military records — including command reports which provide detailed information as to combat operations and movement.  (*See id.* at 100–04).

Mr. Gustat worked on Mr. Pope's case during his employment at the Volunteer Lawyer Resource Center between 1990 and 1995.  Mr. Gustat obtained, among other records, the Marine Command Chronologies for Mr. Pope's unit.  (*See id.* at 105).  Mr. Gustat explained that such records are the sort of information that would typically be supplied to expert witnesses reviewing a case.  (*See id.* at 106).

Mr. Gustat also secured the command chronologies of Mr. Pope's unit, the 1st Battalion, 4th Marine Regiment, 3d Marine Division.  (*See* Def. Ex. F [ECF No. 180-5]).  Mr. Pope's military records (Def. Ex. D [ECF No. 180-4]) make clear that Mr. Pope was a member of this

CASE NO. 91-6717-CIV-ALTONAGA

unit. The "Combat History" entries on Form KAVMC 118(9) in Mr. Pope's military records show he served in combat during the period April 4, 1969 until July 10, 1969 in four different operations, including "Operations against the insurgent communist Viet Cong forces in the Republic of Vietnam;" "Operation Purple Martin in Quang Tri Province, RVN;" "Operation Herkimer Mountain in Quang Tri Province, RVN;" and "Counter Insurgency Operations in Quang Tri Province, RVN." (*Id.* 21). The "Record of Service" entries on Form KAVMC 118(3)-PD in Mr. Pope's military jacket file indicate Mr. Pope was a rifleman in Vietnam from April 9, 1969 until May 19, 1969. (*Id.* 20).

Mr. Pope arrived in Vietnam on April 4 to serve as a rifleman in Company C. The command chronology narrative summaries obtained by Mr. Gustat in 1991 for the month of April 1969 note that:

> April began with the 1st Battalion, 4th Marines heavily engaged with a stubborn NVA force in the area surrounding Fire Support Base Argonne in the Purple Martin AO . . . . Companies "A" and "C" searched the surrounding area for NVA and hostile mortar positions.
>
> \*       \*       \*
>
> Company "C" after landing on Fire Support Base Greene on the 3rd had moved Northwest to the area of Grid XD 734615. Upon arriving on 6 April Company "C" commenced preparation of a landing zone capable of receiving internal loads. The mission of the battalion at this time was to continue search and destroy operations to the North, Northwest, and Northeast of Fire Support Base Greene and clear "internal" landing zones for future employment in the area.
>
> \*       \*       \*
>
>   A patrol from Company "C" on 11 April triggered an NVA booby trap resulting in two emergency medevacs.  . . . A patrol from Company "C" on 12 April was ambushed by an estimated squad of NVA resulting in two friendly KIA and an unknown number of NVA casualties.
>
> \*       \*       \*
>
> Throughout the remainder of the month the Companies continued to find enemy cache sites. Construction of "internal" landing zone sites along the DMZ in zone

42

was continued.

*          *          *

On April 29 Company "B" (-) assumed defense of C-4 and the 2nd Platoon co. "B"
the defense of Oceanview. Company "C" assumed the defense for MyLee area.

*          *          *

COMBAT MISSIONS ASSIGNED

a. Continue Operation Purple Martin.

(Def. Ex F, 10–12).

The narrative summary obtained in 1991 for the month of May 1969, when Mr. Pope

ended his service as a rifleman in Company C on May 19, notes that:

The beginning of May found the battalion at Cua Viet engaged in rest and
rehabilitation. . . After three days the companies were rotated so that all
companies could have a three day rest period; however, the stay at Cua Viet was
shortened due to tactical considerations, resulting in companies "B" and "C"
getting only about half of the programmed three day rest period.  While at Cua
Viet the battalion was under the operational control of the 1t Brigade, 5th
Mechanized Infantry Division, U.S. Army.  This R&R Program . . . contributed
perceptibly to the morale of the Marines who had recently been employed in
extended periods of combat prior to their participation in the program.

On 6 May the Alpha Command group with elements of "H&S" Company.
Company "B" and Company "C" departed for Vandergrift Combat Base (VCB) . .
. . When Company "C" arrived at VCB, they were placed under the operational
control (opcon) of the 3rd Marine Division and was subsequently passed to Task
Force Hotel. On 7 May Company "C" assumed the mission of Sparrow
Hawk/Bald Eagle. This is the code name used to identify the company acting as
the tactical reserve. This company is subject to immediate deployment on short
notice to any part of the Area of Operations (AO). One platoon (Sparrow Hawk)
must be prepared to be employed in twenty minutes, while the remainder of the
company (Bald Eagle) is prepared to move on sixty minutes notice.  Company
"C" was relieved of the responsibility on 9 May.

The battalion was alerted on 8 May to commence "Operation Herkimer
Mountain" and on 9 May the Alpha Command Group and Company "C" were
helilifted to the northwestern corner of the 4th Marines AO with the Alpha
Command Group occupying Landing Zone (LZ) Catapult (XD 626617). The
battalion assumed operational control to Company "C" 2nd Battalion, 4th
Marines, located at FSB Neville and assumed control of the AO.

43

(*Id.* 13).

Included with the narrative summary for May 1969 is another section of the report listing significant action seen by Mr. Pope's Company "C" in his last weeks before the transfer to the rear of the combat zone after May 19, 1969:

12 May: At 0630H Company "C" located at LZ Catapult, received approximately 18 rounds of 82MM mortar fire from suspected enemy positions at XD 849649. The company fired 81MM mortars, and called in artillery fire and an airstrike on the suspected enemy position. . . .

At 1200H Company "C" found a bunker complex running along the trail in a northerly direction between Grid XD 828-610 and 830613. . . . The company also found two graves at XD 833607 covered with stones. They had stakes at both ends and were fenced in by rope. The graves were five or six feet deep with one body in each one. The bodies were deteriorated with no markings on the uniforms.

At 1020H Company "C" also found four AK-47 magazines, eight Chinese Communist Grenades, nine "E" tools, six ponchos, three hammocks, one canteen, two medium size claymores, five small picks, two large cooking pots, small bowls, one block of TNT, one saw, one tube (substance unknown), two machetes, two small green bags, and 25 pounds of rice. All articles were found in a complex of 16 bunkers at XD 867511. The bunkers were either new or under construction.

                    *                    *                    *

14 May: At 0045H Company "C" spotted one NVA outside of their perimeter at XD 826615. Two hostile grenades were thrown from the outer perimeter, resulting in one Marine being wounded.  Small arms fire and hand grenades were returned with unknown results.

                    *                    *                    *

16 May: At 0912H Company "C" found a cave complex which was estimated to be three months old, and large enough to accommodate at least 40 persons.  The company searched the area and found 54 AK-47 rounds, one 82MM mortar round and two Chinese Communist grenades.  All items were destroyed in place.

                    *                    *                    *

17 May: At 0900H Company "C" found two boxes of AK-47 rounds with 550 rounds in each box. They also found three living hootches and one kitchen located inside a cave.

44

CASE NO.  91-6717-CIV-ALTONAGA

(*Id.* 14–16).

       d.     *Scott Eber*

Mr. Eber, Mr. Pope's trial attorney, is currently employed as an anesthesiologist.  (*See* T. Vol. 4 at 2–21 [ECF No. 184]).  Mr. Eber was appointed to represent Mr. Pope following the withdrawal of Mr. Pope's prior public defender, Douglas McNeil.  (*See id.* at 3–4).  Mr. Eber has no memory of ever meeting with Mr. McNeil to discuss the preparations and events of the case prior to Mr. Eber's appointment.  (*See id.* at 4).  Mr. Eber had never handled a penalty phase proceeding prior to Mr. Pope's case (*see id.* at 20), had no particular training in how to handle such penalty phase proceedings (*see id.*), and had no one helping him prepare the penalty phase defense case for Mr. Pope (*see id.* at 19).  In fact, Mr. Eber could not recall working on any death penalty case prior to Mr. Pope's.  (*See id.* at 4).  Not surprisingly, Mr. Eber's memory of his involvement in Mr. Pope's case has not improved in the years following his postconviction deposition (*see id.* at 6), which the Court relied on in the December 8 Order.

When presented with portions of the record indicating that Dr. Weitz was requested to evaluate Mr. Pope prior to Mr. Eber's involvement in the case, Mr. Eber had no independent recollection.  (*See id.* at 6).  Mr. Eber did not recall having given Dr. Weitz any instructions or background materials regarding Dr. Weitz's evaluation of Mr. Pope (*see id.* at 9–10), and could not say why he did not use Dr. Weitz as a witness during the penalty phase (*see id.* at 16).  Mr. Eber had no recollection of having requested a continuance of Mr. Pope's trial due to personal illness in December of 1981, prior to the December 14, 1981 trial date.  (*See id*. at 7).  Mr. Eber had no independent recollection of having argued to the judge during the sentencing hearing following the penalty phase of the trial for statutory mitigators based on Dr. Weitz's report (*see id.* at 11–12), but acknowledged his argument must have been unsuccessful, as the sentencing

court found no statutory mitigation (*see id.* at 15).

Mr. Eber did not recall making a series of statements to the sentencing court regarding Mr. Pope's potential PTSD and military service (*see id.* at 15–16), statements which were not presented to the jury during the penalty phase.  Mr. Eber did not recall any problems communicating with Mr. Pope (*see id.* at 18–19), but could not recall discussing any specific penalty phase or mitigation strategies with Mr. Pope either (*see id.* at 20).  Mr. Eber recalled Mr. Pope being respectful to the court during his trial.  (*See id.* at 19).

### 2.      The State's Witness

The State called a single witness, Dr. Damarys Sanchez.  Dr. Sanchez received a doctorate in clinical psychology in 2005, was licensed in Florida in 2007, and has no experience with the applicable diagnostic manuals relevant to the evaluations in this case.  She has no specialty in her field, has limited familiarity with treating individuals with post-combat PTSD, and has not testified in a death penalty case before this case.  (*See id.* at 45–49).  Dr. Sanchez opined that it was inappropriate to consider Mr. Pope's PTSD as a mitigator because there was no "causal connection" between the mitigating mental health issue and the criminal acts (*see id.* at 58), and "there's no indication of any posttraumatic stress disorder at the time of the crime" (*id.* at 41).  Dr. Sanchez did not address nonstatutory mitigation.  (*See id.* at 59).  She confirmed that the nature of her disagreement with Drs. Price and Weitz was whether the existence of statutory mental health mitigation was an appropriate legal conclusion.  (*See id.* at 61).  Her disagreement was not with their diagnoses.  Remarkably, as to her view of that legal issue, Dr. Sanchez believed that, regardless of her disagreement with the experts, the jury should "have the opportunity to hear all testimony involved related to [their opinions]."  (*Id.* at 62).  Thus, even the State's expert appreciated the materiality of the defense evidence to the jury's assessment of the appropriate penalty.

# IV.    ANALYSIS

## A.    The Decision of the Florida Supreme Court

Turning to the decision of the Florida Supreme Court, the Court agrees with the Eleventh

Circuit when it described the decision as "unilluminating." *Pope*, 680 F.3d at 1285.  The entire

opinion addressing Mr. Pope's penalty phase claim reads as follows.

> We also affirm the summary denial of the following claims of ineffective
> assistance: 1) trial counsel failed to confer properly with Pope before and during
> trial and failed to prepare Pope to testify; 2) trial counsel failed to object and
> move for a mistrial when hearings and sentencings of other defendants occurred
> in the jury's presence; 3) trial counsel failed to object to improper comments by
> the prosecutor; 4) trial counsel failed to impeach state witness Eckhart; 5) trial
> counsel failed to investigate evidence or present testimony that others could have
> killed the victims; and 6) *trial counsel failed to present evidence of mitigating
> circumstances during the penalty phase*. We have reviewed the motions, files, and
> records in this case and agree with the trial court that *they conclusively
> demonstrate that Pope is entitled to no relief* in connection with the above claims.

*Pope v. State*, 569 So. 2d at 1245 (footnote omitted) (emphasis added).

In analyzing Mr. Pope's claim, the Court considers the record as it existed before the

Florida Supreme Court in 1990.  *See Pinholster*, 131 S. Ct. at 1398-1400.  On appeal, Mr. Pope

argued to the Florida Supreme Court that his counsel was ineffective at the penalty phase

because "Eber failed to present evidence of mitigating circumstances during the penalty phase of

Pope's trial."  (State Record, Index Ex. E. 51 [ECF No. 42]).  While Mr. Pope's appellate brief

lacked specific factual assertions, it did plainly assert that counsel: (1) had failed to investigate,

(2) offered "only the standard plea for life from Mr. Pope's mother" and (3) "given the lengthy

period of deliberation of guilt, two jury recommendations of life, and far from unanimous, single

recommendation of death, the presentation of convincing evidence and argument for life was all

the more important." (*Id.* at 52).  These arguments address both the deficiency and prejudice

prongs of a *Strickland* analysis.

CASE NO.  91-6717-CIV-ALTONAGA

In the *de novo* review of this claim addressed in the December 2008 Order, the Court concluded that Mr. Pope satisfied the deficiency and prejudice prongs of *Strickland* on the record as it existed in 1990, before any evidence was admitted at the 2012 Hearing.  The remaining question is whether or not the Florida Supreme Court's denial of this claim was unreasonable pursuant to section 2254(d).  The Court must find that "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents."  *Harrison v. Richter*, 131 S. Ct. 770, 783 (2011).  In other words, as a condition for obtaining habeas relief here, Mr. Pope must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.  *See id.* This is indeed such a case.

*Strickland*, the clearly established federal law applicable to this claim, held that "a lawyer has a duty to conduct a thorough investigation of possible mitigating evidence." 466 U.S. at 853. In the period between the *Strickland* decision in 1984 and Mr. Pope's appeal in 1990, the United States Supreme Court revisited penalty phase ineffective assistance of counsel claims on at least two occasions that bear discussing here.  *See Darden v. Wainwright*, 477 U.S. 168 (1986), and *Burger v. Kemp*, 483 U.S. 776 (1987).  These cases illustrate precisely why the Florida Supreme Court's decision was unreasonable.

Unlike Mr. Pope's counsel, trial counsel for Willie Darden spent a great deal of time preparing for the sentencing proceedings:

> As an initial matter, petitioner contends that trial counsel devoted only the time between the close of the guilt phase of trial and the start of the penalty phase-approximately one-half hour-to preparing the case in mitigation. That argument is without merit. Defense counsel engaged in extensive preparation prior to trial, in a manner that included preparation for sentencing. Mr. Jack Johnson, head of the Public Defender's office at the time, stated to the habeas court that "we had expended hundreds of hours on [petitioner's] behalf trying to represent him," and

48

CASE NO.  91-6717-CIV-ALTONAGA

> that his office "worked very hard on the case." Mr. Goodwill, an experienced
> criminal trial lawyer, testified that he "spent more time on this case than I spent
> on . . . any capital case I have been involved in, probably more time than any case
> I've ever been involved in." That included time investigating petitioner's alibi,
> and driving petitioner around the scene of events to establish each point of his
> story. Counsel obtained a psychiatric report on petitioner, with an eye toward
> using it in mitigation during sentencing. Counsel also learned in pretrial
> preparation that [the victim's wife] was opposed to the death penalty, and
> considered the possibility of putting her on the stand at the sentencing phase. The
> record clearly indicates that a great deal of time and effort went into the defense
> of this case; a significant portion of that time was devoted to preparation for
> sentencing.

*Darden*, 477 U.S. at 184-85 (citations to the record omitted; some alterations added).  Similarly,

trial counsel in *Burger* also conducted a reasonable investigation before making a strategic

determination not to present mitigating evidence:

> Leaphart was aware of some, but not all, of this family history prior to petitioner's
> trial. He talked with petitioner's mother on several occasions, an attorney in
> Indiana who had befriended petitioner and his mother, and a psychologist whom
> Leaphart had employed to conduct an examination of petitioner in preparation for
> trial. He reviewed psychologists' reports that were obtained with the help of
> petitioner's mother. He also interviewed Stevens and other men at Fort Stewart.
> Based on these interviews, Leaphart made the reasonable decision that his client's
> interest would not be served by presenting this type of evidence.

*Burger*, 483 U.S. at 790-91 (citations to the record and footnote call number omitted).  The facts

of these two cases are conspicuously different from the facts presented to the Florida Supreme

Court, which show no preparation by defense counsel for Mr. Pope's sentencing hearing.  To

borrow an adverb, the record "conclusively" shows Mr. Eber conducted no investigation.  The

record also shows Mr. Eber made no strategic decisions regarding whether or not to put on a case

in mitigation.[14]

---

[14]   The State argues "Pope ignores the fact that he hindered counsel in the penalty phase presentation
going so far as informing the trial court that he did not want to present any mitigation." (State Mem., 11).
While it is true that Mr. Pope advised the court that he did not want any mitigation evidence presented, it
is an exaggeration to assert that he "hindered" counsel.  The record shows that the penalty phase began
late at night within minutes of the guilty verdict. (*See* State Record, Ex A, Vol. VI of VII, at 98). Mr. Eber
testified that prior to the penalty phase he did not employ an investigator because he did not know "who

CASE NO.  91-6717-CIV-ALTONAGA

On this record, no fairminded disagreement can exist that the Florida Supreme Court's conclusion that the record "conclusively demonstrate[s]" Mr. Pope was entitled to no relief is not only incorrect, but it was also an unreasonable application of clearly established federal law. The only information before the Florida Supreme Court in 1990 was that the jury heard: (1) a simple plea for mercy, (2) less than four pages of argument from Mr. Eber and (3) the prosecutor's unobjected-to remark that Mr. Pope favored death.  Notwithstanding this poor showing, the jury *still* returned a nine to three death recommendation, showing a reasonable probability that had Mr. Eber investigated and put forth at least some mitigation evidence, the jury would have recommended life.  Without more, it is difficult, if not impossible, to understand how this was not considered deficient performance at the penalty phase of a capital trial.  Put differently, the record before the Florida Supreme Court did not "conclusively demonstrate" that Mr. Pope was "entitled to no relief" as to his penalty phase ineffective assistance claim. *Pope*, 569 So. 2d at 1245.  To conclude otherwise was unreasonable.

The State nevertheless insists that counsel's "lack of memory" is not a valid basis for finding *Strickland* deficiency and prejudice, nor is it a valid basis for concluding the Florida Supreme Court's decision was unreasonable.  The State also asserts that Mr. Pope has failed to "address the fact that the record establishes that there was evidence presented by counsel in the

---

was going to pay for it." (State Record, Ex. D, Vol. II of III, at 154).  He did not obtain the appointment of an expert until February 10, 1982, a mere six days before trial. (State Record, Ex. A, Vol. VII of VII, at 66). Therefore, the Court rejects the assertion that somehow there would have been a well investigated and strategic penalty phase had Mr. Pope not "hindered" it.  Moreover, the Eleventh Circuit has held that while "many of the cases where counsel's decision to forego investigating or presenting mitigating evidence based on a competent client's clear instruction has been considered effective assistance," there should also be "ample testimony" of "counsel's strategic decision not to present mitigating evidence, *and* [that] counsel . . . explained the mitigating evidence to the defendant."  *Pope*, 680 F.3d at 1292 (emphasis in original; alteration added) (citing *Reed*, 593 F.3d at 1240; *Cummings*, 588 F.3d at 1361; *Newland*, 527 F.3d at 1209).  There is no evidence in the record before the state court to indicate any of this ever occurred.

guilt phase which was in support of Pope's 'psychological history' and 'performance in the military.'" (State Mem., 4).   The Court addresses these arguments in turn.

First, Mr. Pope's arguments do not focus solely on Mr. Eber's lack of memory.  Indeed, Mr. Pope has never suggested that trial counsel was ineffective "merely because counsel cannot recall the basis for his actions." (*Id.*).  While it is true that Mr. Eber remembered little to nothing about the trial, his strategy, or what he did in preparation for the penalty phase, counsel's memory failure is not the primary basis for Mr. Pope's claim.  The record before the Florida Supreme Court in 1990 was limited to one unfinished postconviction deposition taken to address guilt phase ineffectiveness, and the remainder of the record contains no evidence of Mr. Eber's memory one way or another.  The Court's consideration here is not so much on whether Mr. Eber could remember pursuing a particular strategy or making a tactical decision.   Rather, the unrebutted facts presented to the Florida Supreme Court are that that Mr. Eber did nothing for the penalty phase and had no strategic basis for doing nothing.  There was no evidence that Mr. Eber investigated or presented any mitigation evidence whatsoever (except for the one page of Mr. Pope's mother's testimony), or discussed with Mr. Pope the investigation he was foregoing and the evidence he was electing not to present to the sentencing jury.   The absence of any information which would have shown the Florida Supreme Court that there was a particular strategic or tactical reason for putting on no mitigation is what the Court considers.  To be clear, the fact that there was no information which would indicate that Mr. Eber was justified in his failure to present mitigation makes the determination all the more unreasonable.

The State's second argument is that because Dr. Weitz testified in the guilt phase, evidence supporting mitigation was presented to the jury.  Consequently, the State argues, Mr. Eber's performance was not deficient.  But the record does not support this assertion. While Dr. Weitz did testify during the guilt phase, his testimony addressed guilt phase issues (i.e.,

CASE NO. 91-6717-CIV-ALTONAGA

competency to stand trial, ability to understand right and wrong, and knowledge of the nature and consequences of his crimes). Perhaps the best evidence of the limited nature of Dr. Weitz's testimony comes from the drafter of the pre-sentence investigation report, the probation officer, in response to an objection from Mr. Eber during the *Spencer* hearing:

> The reason I did not address [PTSD] in the pre-sentence report, even though I hadn't discussed it with the Doctor until yesterday, is the fact Mr. Eber told myself that they did not raise a defense of insanity at the time of the alleged offenses, they were going with total innocence, so he didn't bring this up at trial, they weren't saying that this was a problem.
>
> \*    \*    \*
>
> So, in that aspect that's why in the mitigating circumstances I did not address the issue of post-trauma because that wasn't addressed in trial, and the Doctor more or less touched on permanent traits with me, and did not get into that.

(State Record, Vol. A, Vol. VI of VII, 143-44) (alteration added). To assert that Dr. Weitz's limited testimony during the guilt phase could be counted as mitigation evidence presented at sentencing by Mr. Eber is unreasonable. While the Court agrees it is not, *per se*, deficient when counsel decides not to present mental health mitigation evidence when such is available, such was not the case here.

The sentencing judge rejected statutory mental health mitigation because "there is nothing to indicate that you were under any type of mental or emotional disturbance during the week-end of January 16th or 18th, 1981, nor does the testimony of Dr. William A. Weitz reveal any mental disturbance beyond a predisposition to survive, and we all want to survive, in a world that you perceive has unjustly treated you." (*Id.* at 152). Even Mr. Eber acknowledged it was not his intent at trial to have Dr. Weitz's guilt phase testimony be considered in mitigation. As his closing argument at the *Spencer* hearing reflects, Mr. Eber "talk[ed] about something that Dr. Weitz touched on only very briefly, because it wasn't really the point of []sic defense to get into

it . . ." (*Id.* at 138).[15]  The State's argument that Dr. Weitz's testimony at the guilt phase of the trial was sufficient to satisfy the performance prong of *Strickland* is rejected, and it provides no support for the Florida Supreme Court's denial of this claim.

The Florida Supreme Court's decision is unreasonable even under a doubly deferential lens.  The Court reaches this conclusion while understanding the highly deferential standard which applies to the state court's decision. "Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Premo v. Moore*, 131 S. Ct. 733, 740 (2011).  The Court must answer this last question in the negative.  Likewise, the Court finds that the Florida Supreme Court's implied determination that Mr. Pope was not prejudiced by his counsel's failure is unreasonable.  Mr. Pope has met his burden pursuant to section 2254(d).  The Court next considers the evidence adduced during the section 2254(e) hearing, conducting a *de novo* review.

**B.    Application of Section 2254(e) evidence to the Section 2254(a) analysis**

As the Court has resolved the underlying section 2254(d) issue, the undersigned now tests Mr. Pope's allegations in light of the evidence presented during the 2012 Hearing under section 2254(a).  For the reasons that follow, Mr. Pope's allegations — allegations which the Eleventh Circuit has already determined to be sufficient to meet the requirements of section 2254(a) if proven[16] — are supported by the evidence.

---

[15] Mr. Eber did not argue that Mr. Pope suffered from PTSD to the jury.  Likewise, he failed to argue Mr. Pope's military service to the country, specifically his service in Vietnam, as a mitigating factor.  The *Spencer* hearing was the first time this issue was raised.

[16] Specifically, the Eleventh Circuit determined that Mr. Pope's "allegations, considered together, are powerful, and *if* he is able to prove they are true, he would be entitled to habeas relief." *Pope*, 680 F.3d at

### 1.  Deficient Performance

The Eleventh Circuit described Mr. Pope's claims of deficient performance under the

*Strickland* standard as follows:

> "Eber failed to present any evidence of mitigating circumstances during the
> penalty phase of defendant's trial other than the standard plea of mercy from the
> defendant's mother," and that "Eber did little or nothing to develop evidence of
> such mitigating factors such as defendant's *psychological history, performance in
> the military,* or his *capacity for rehabilitation.*"  (Emphases added).  Petitioner's
> motion also alleged that the prosecutor "made prejudicial and improper
> comments" — including telling the jury that Pope "had expressed a preference for
> the death penalty —  even though that preference had been voiced outside the
> presence of the jury and was wholly irrelevant to any issue before them," but
> "Eber improperly chose not to voice any objection." As for prejudice, Pope
> alleged that Eber's "failure to present any other mitigating circumstances
> increased the likelihood that the jury would return an advisory sentence of death .
> . . . But for this failure of proof, there is a reasonable probability that the jury
> would have recommended life for the killing of Walters." And, Pope said, "[t]he
> failure of Eber to object to these . . . prosecutorial comments . . . prejudiced
> defendant and deprived him of the fair and impartial trial guaranteed by the
> Federal and State Constitutions."

*Pope*, 680 F.3d at 1290.  Mr. Pope has supported these allegations.

The evidence presented during the 2012 Hearing on Mr. Pope's claims demonstrates that

Mr. Eber did not conduct a sufficient investigation.  Prior to receiving Mr. Pope's case from

Douglas McNeil, Mr. Pope's original lawyer, Mr. Eber had never handled a penalty phase (*see* T.

Vol. 2 at 20), had no training in how to handle such penalty phase proceedings (*see id.*), and had

no one helping him prepare the penalty phase defense case for Mr. Pope (*see id.* at 19).  Mr. Eber

has no memory of ever meeting with Mr. McNeil to discuss the preparations and events of the

case prior to Mr. Eber's appointment.  (*See id.* at 4).

---

1294 (citation omitted).  If, under the Eleventh Circuit's reasoning, Mr. Pope will be entitled to relief if
his allegations are true, *a fortiori* he is being held "in custody in violation of the Constitution or laws or
treaties of the United States," 28 U.S.C. § 2254(a).

Mr. Eber did not meaningfully utilize Dr. Weitz.  Dr Weitz was first approached by Mr. McNeil, not by Mr. Eber.  And Mr. Eber's only use of Dr. Weitz, who had already been brought into the case and was available, was to contact the expert just days before the trial so he could do a cursory examination of Mr. Pope.  Indeed, Mr. Eber was not even attempting to obtain useful information from Dr. Weitz, as the attorney declined to so much as provide Dr. Weitz with needed records so that Dr. Weitz could reach an informed opinion.  Dr. Weitz testified that he obtained only a "few pages" from Mr. Eber that were "not nearly the kinds of records, background information, data that [he] normally require[s] . . . ."  (*Id.* at 23).  Dr. Weitz explained that Mr. Eber did not spend any significant time with him in order to prepare his testimony.  (*See id.* at 24).  Most importantly, the scope of Dr. Weitz's evaluation was to look at competence and sanity only; indeed, the attorney declined to even attempt to utilize Dr. Weitz as a penalty phase expert.   (*See id.* at 25).  The evaluation thus had nothing to do with the penalty phase and cannot be said to serve as a mitigation investigation.

At the 2012 Hearing, Mr. Eber could not say why he did not use Dr. Weitz as a witness during the penalty phase (*see* T. Vol. 4 at 16), and was certainly unable to provide any strategic explanation for his failure to do so.  This point is particularly problematic because the evidence clearly indicates that Mr. Eber was aware that Mr. Pope suffered from PTSD.  Dr. Weitz diagnosed Mr. Pope with PTSD in his report, which Mr. Eber had.  (*See* T. Vol. 2 at 29).  In fact, Mr. Eber even argued to the sentencing judge, prior to the conclusion of the penalty phase and receipt of the jury's recommendation, that Dr. Weitz's report supported finding statutory mitigators and Mr. Pope likely had PTSD from his military service.  (*See* T. Vol. 4 at 15–16).  Mr. Eber's argument to the sentencing judge, however, did not satisfy his obligation under *Strickland* to present a mitigation case to the jury; it merely confirms that Mr. Eber had the information available to him, believed the argument to be worth making since he made it to the

CASE NO.  91-6717-CIV-ALTONAGA

judge after the jury had given its recommendation, and should have acted on it at the penalty phase.

The State has argued that Mr. Pope instructed his trial counsel not to present mitigating evidence, and therefore counsel did not perform deficiently.  *Cf. Knight v. Dugger*, 863 F.2d 705, 750–52 (11th Cir. 1988) (reasoning counsel may not be faulted for not presenting mitigating evidence after he investigated options, but defendant refused to permit presentation).   The Eleventh Circuit addressed this contention, finding that counsel nevertheless had *Strickland* obligations to perform effectively in representing Mr. Pope at his penalty phase.  As the Eleventh Circuit explained:

> [W]e have previously found counsel's performance deficient where he acceded to his client's instructions not to investigate or present mitigating evidence despite his belief that his client had mental health issues.  *Thompson v. Wainwright*, 787 F.2d 1447, 1451–52 (11th Cir. 1986); *see also Blanco*, 943 F.2d at 1500–03 (deeming counsel's failure to investigate to be deficient performance when counsel conducted no pretrial investigation, even though defendant had provided information on his background and was "noticeably morose and irrational" when instructing counsel not to present any mitigation witnesses). This is especially true when in doing so the "attorney foregoes a defendant's only plausible line of defense."  *Foster v. Dugger*, 823 F.2d 402, 407 n.16 (11th Cir. 1987).
>
> Moreover, in many of the cases where counsel's decision to forego investigating or presenting mitigating evidence based on a competent client's clear instruction has been considered effective assistance, there was ample testimony regarding counsel's strategic decision not to present mitigating evidence, *and* counsel had explained the mitigating evidence to the defendant. *See, e.g., Reed v. Sec'y, Fla. Dep't of Corr.*, 593 F.3d 1217, 1240 (11th Cir. 2010); *Cummings*, 588 F.3d at 1361; *Newland v. Hall*, 527 F.3d 1162, 1209 (11th Cir. 2008).  And, in the cases collected and described in *Cummings*, the records were clear that the defendants had instructed counsel to forego not only the presentation of mitigating evidence, but also its *investigation*.

*Pope*, 680 F.3d at 1294 (footnote call number omitted); *see Williams v. Woodford*, 384 F.3d 567, 622 (9th Cir. 2004) ("A defendant's insistence that counsel not call witnesses at the penalty phase does not eliminate counsel's duty to investigate mitigating evidence or to advise the defendant of

the potential consequences of failing to introduce mitigating evidence, thereby assuring that the defendant's decision regarding such evidence is informed and knowing."); *see also Detrich*, 677 F.3d at 978 (counsel must investigate available records "even where a defendant is 'actively obstructive'") (quoting *Rompilla v. Beard*, 545 U.S. 374, 381 (2005)).

While the Eleventh Circuit was concerned as to whether Mr. Pope gave Mr. Eber any particular instructions with regard to the penalty phase investigation, *see id.* at 1292, Mr. Eber did not recall Mr. Pope instructing him not to present mitigation evidence or whether counsel performed any mitigation investigation at all.  (*See* T. Vol. 4 at 13).  Mr. Eber could not recall discussing any specific penalty phase or mitigation strategies with Mr. Pope.  (*See id.* at 20).  Without Mr. Eber being able to illuminate this point, the Court is left with the remaining evidence to determine whether Mr. Eber conducted an investigation.  As described, that evidence shows no effort to investigate, no effort to secure witnesses, no effort to employ the information provided by Dr. Weitz, and no effort to develop any mitigation case whatsoever.  The State did not present any evidence that an investigation took place.  On these facts, it is clear that no mitigation investigation was conducted, and thus counsel failed to provide Mr. Pope with necessary information to consider in deciding whether to present mitigation.

Finally, Mr. Eber failed to raise an objection when the prosecutor improperly informed the jury that Mr. Pope had expressed a desire to receive the death penalty rather than a life sentence.  The fact that the very psychological and emotional problems that were improperly omitted from the mitigation presentation at trial likely played into Mr. Pope's expressed desire (and the trial court's refusal to allow those desires to interfere with defense counsel's responsibility to present mitigation and the jury's ability to properly assess a complete mitigation case by finding that Mr. Pope's statement served as a waiver of mitigation), makes it all the more problematic that the statement of his desire for death over life was relayed to the jury but not the

CASE NO.  91-6717-CIV-ALTONAGA

psychological backdrop that gave rise to it.

On the basis of the evidence presented, the Court finds that Mr. Pope has proven his allegations of deficient performance.

### 2.  Prejudice

The Eleventh Circuit described Mr. Pope's claims of prejudice under the *Strickland* standard as follows:

> Pope has alleged that because trial counsel failed to object to the prosecutor's comment to the jury that Pope preferred the death penalty, it was manifestly easier for the jury to recommend death.  In addition, he has alleged that due to trial counsel's failure to conduct any penalty-phase investigation, the jury was not made aware that Pope suffered an abusive and impoverished childhood; exhibited many positive personality traits; began experimenting with drugs as a result of his Vietnam experience; escalated his drug use after he returned home; continued to suffer from the consequences of the war; and exhibited substantial mental health issues, including post-traumatic stress disorder, organic delusional disorder, substance abuse disorder, and bipolar disorder.  In particular, Pope claims that Eber failed to explain to the jury how Pope's Vietnam experiences affected his drug use, his psychological state, and the actions Pope allegedly took during the weekend of the murders.  The jury also did not hear about the peculiarities of Pope's mental state, and how because of Pope's pre-Vietnam childhood and mental disorders, Pope was more dramatically affected by these things than the average Vietnam veteran would have been . . . .

> Nor did the jury hear that, according to Pope's experts, his behavior at the time of the murders satisfied two statutory mitigating circumstances — (1) extreme emotional or mental disturbance, *see* Fla. Stat. § 921.141(6)(b); and (2) diminished capacity to conform his conduct to the requirements of the law, *see id.* § 921.141(6)(f) — or that several non-statutory mitigating circumstances, including his impoverished and abusive childhood and his capacity for rehabilitation, applied.  Indeed, Pope has alleged, through his experts' affidavits, that his mental illnesses, both singularly and in combination, impaired all aspects of his cognitive and emotional processes and left him predisposed to act in an irrational manner when confronted with even minimal stressors.  His experts say that his chronic and acute abuse of drugs also impaired his critical judgment, perception of others, and interaction with others, so that Pope's judgment was impaired to a substantial degree at the time of the murders.  The experts further opine that the combination of increasing confusion and stressful events caused gross impairment of Pope's already impoverished cognitive ability and of his already severely compromised ability to act volitionally.  According to these experts, his drug dependence influenced his actions and caused him to behave in violent and unpredictable ways completely inconsistent and at odds with his prior

history and background of nonviolence.  As a result, the experts opine, these conditions affected Pope's behavior by potentiating that he would overreact in an irrational, combative, and even violent way, with no appreciation for the consequences of his behavior.

*Pope*, 680 F.3d at 1293–94.  Mr. Pope has presented ample evidence, consist with his allegations, that establishes the impact of his abusive and impoverished childhood, his drug abuse, his military service, and the profound effect that service had on him psychologically at the time of the crimes.

Mr. Pope was raised in abject living conditions.  The focus was primarily on survival, leaving no room for affection or nurturing.  There was a lack of clothing and food, and his parents engaged in severe disciplinary abuse.  Upon coming of age, Mr. Pope chose to go to war even though he was offered a medical discharge due to a serious injury; this showed a positive personality trait.  His wartime experiences were brutal and grim, marked by the witnessing of exploding bodies of friends and the constant immediacy of imminent death.  Mr. Pope's wartime experiences led him to begin using drugs and later to become wildly abusive of drugs as a means of coping with his emotional torment and the ugliness of his post-war environment.  His drug abuse aggravated his PTSD and other mental heath conditions.  His mental health conditions and drug use clearly affected his cognitive functioning and judgment.  He was alienated and subjected to anti-war ridicule.

His personal relationships were superficial and strained, including his marriage, which did not last long and ended in divorce.  He had no home of his own.  He could not keep a job.  And he began engaging in bizarre behaviors which were indicative of profound psychological problems, such as dissociative experiences in which he went on search-and-destroy missions alone in the woods, digging a system of tunnels around the house in which he was living.  He was obsessed with guns and seemingly the killing he had witnessed with them.

Drs. Price and Weitz reached remarkably consistent diagnoses, with severe post-war PTSD at their center, and both provided compelling testimony establishing the presence of two statutory mitigators related to Mr. Pope's mental health issues: emotional disturbance and impaired ability to conform his conduct to the law.

The jury that was not made aware of any of this mitigating information nevertheless recommended death by a vote of nine-to-three.  In other words, three jurors found a life sentence appropriate in this case even without being aware of the occurrences that shaped Mr. Pope's life and mind in the years preceding the crimes.  Thus, the probability of a different outcome had this evidence been presented is even more likely.

The State did not undermine or rebut the essential importance of this information.  The Court gives little weight to Dr. Sanchez's opinion that it is inappropriate to consider Mr. Pope's PTSD as a mitigator in this case because there was no "causal connection" between the mitigating mental health issue and the criminal act (*see* T. Vol. 4 at 58), as that is a legal conclusion.  Dr. Sanchez did not challenge the diagnoses or professional opinions of Drs. Price and Weitz, but merely disagreed with the legal significance of those diagnoses.  Dr. Sanchez even confirmed that the nature of her disagreement with Drs. Price and Weitz was whether the existence of statutory mental health mitigation was an appropriate legal conclusion.  (*See id.* at 61).  The error in the doctor's approach became all-the-more clear when she admitted that she did not address nonstatutory mitigation (*see id.* at 59), agreeing with Mr. Pope that, regardless of her disagreement with the experts, the information provided by the defense experts was crucial enough that the jury should have been allowed to consider it prior to giving its recommendation regarding Mr. Pope's sentence (*see id.* at 62).

That fact fits soundly within the Supreme Court's treatment of this issue, as it has found it improper to speculate as to ways that the jury might discount defense evidence.  *See Cain*, 132 S.

Ct. at 630; *Porter*, 130 S. Ct. at 454; *Kyles*, 514 U.S. at 449, n.19.  Even knowing this, the State urged its witness to opine on whether she could "discount" the existence of mitigation "based on the facts of the crime."  (T. Vol. 4 at 31).  This was improper, particularly because the facts surrounding the crimes were already known to the jury and thus already contemplated in its nine-to-three recommendation.  In other words, that information has already been factored into the calculus, and the issue in postconviction proceedings is whether there was more evidence that could have been added to the mitigation side of the scale by the defense attorney at trial, not whether the State could improve its case for death.

Finally, the prejudice from the prosecutor's improper remarks is evident.  Even knowing that Mr. Pope had expressed a desire to receive death over life, the death recommendation was not unanimous.  Three jurors voted for a life sentence.  There is a reasonable probability that had the prosecutor not made the inappropriate closing remark and had trial counsel presented the mitigation case seen in postconviction proceedings, the outcome of the penalty phase would have been different.   The clearest description of *Porter* error is found in *Sochor v. Sec'y, Dept. of Corr.*, where the court explained:

> As measured against the decision of the Supreme Court of the United States in *Porter II*, the Supreme Court of Florida unreasonably applied *Strickland* to decide the issue of prejudice in *Sochor IV* when it failed to consider or discounted entirely the mental health evidence that Sochor had presented in the postconviction evidentiary hearing. In *Porter II*, the Supreme Court of the United States ruled that the Supreme Court of Florida had unreasonably applied clearly established federal law in *Porter I* when it "either did not consider or unreasonably discounted the [mental health] mitigation evidence [that Porter] adduced in the postconviction hearing." The Supreme Court of the United States ruled that it was unreasonable for the Supreme Court of Florida to "discount entirely" the impact that the testimony of Porter's neuropsychologist might have had on the sentencing judge and jury based on the fact that the experts offered by the state disagreed with the conclusions of Porter's expert. *Id.* at 455.  As the Supreme Court of the United States explained, "[w]hile the state's experts identified perceived problems with the tests that [Porter's neuropsychologist] used and the conclusions he drew from them, it was not reasonable to discount entirely the effect that this testimony might have had on the jury or the sentencing judge."

CASE NO.  91-6717-CIV-ALTONAGA

*Id.* The Supreme Court of the United States also ruled that it was unreasonable for the Supreme Court of Florida to fail to give "any consideration for the purpose of nonstatutory mitigation to [the testimony of Porter's neuropsychologist] because '[u]nder Florida law, mental health evidence that does not rise to the level of establishing a statutory mitigating circumstance may nonetheless be considered by the sentencing judge and jury as mitigating.' " *Id*. (citing *Hoskins v. State*, 965 So.2d 1, 17–18 (Fla. 2007)). As the Supreme Court of the United States explained, "the Constitution requires that 'the sentencer in capital cases must be permitted to consider any relevant mitigating factor.'" *Id*. (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 112, 102 S.Ct. 869, 875, 71 L.Ed.2d 1 (1982)).

685 F.3d 1016, 1029 (11th Cir. 2012).  The Court is not inclined to make the same *Porter* error of unreasonably looking for ways to discount mitigating evidence in the form of compelling expert testimony rather than considering how that evidence may have weighed in favor of a recommendation for life in the minds of the jurors.

## V.  CONCLUSION

Mr. Pope has met his burden under sections 2254(d) and (e), and is entitled to habeas relief.  Mr. Pope's "allegations, considered together," are indeed "powerful," *Pope*, 680 F.3d at 1294 (citation omitted) (emphasis in original).  Mr. Pope has proven the allegations to be true, and as such, is entitled to habeas relief.  *Id*.  The 2012 Hearing uncovered "new, relevant evidence," *id*. 1294, n.16 (quotations omitted), that was not before the state court, namely, the records of Mr. Pope's military service, the experts' testimony concerning the effects of PTSD upon Mr. Pope, and the State's own expert's concession that a sentencing jury should be allowed to evaluate the experts' differing views on the effects of PTSD upon Mr. Pope.  Under a *de novo* standard of review, such evidence proves, consistent with the Eleventh Circuit's discussion, that Mr. Pope is being held in custody in violation of the Constitution or laws of the United States. *See* 28 U.S.C. § 2254(a).

Accordingly, it is

**ORDERED AND ADJUDGED** that Mr. Pope's Amended Petition for Writ of Habeas

CASE NO.  91-6717-CIV-ALTONAGA

Corpus **[ECF No. 18]** is **GRANTED** in part.  The convictions remain undisturbed.  However, a Writ of Habeas Corpus shall issue upon the bases stated herein.  It is the Order of the Court that Petitioner, Thomas Dewey Pope, should receive a new sentencing hearing before an untainted jury within ninety (90) days of the date of this Order, unless the Respondent files a timely appeal and obtains a stay of this Order.  The Clerk of the Court is instructed to **CLOSE** the case.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 26th day of March, 2013.

_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

copies provided to:
counsel of record